# UNITED STATES DISTRICT COURT
### for the
### Eastern District of California

| | | |
|---|---|---|
| United States of America | ) | **FILED** |
| v. | ) | Sep 20, 2021 |
| | ) | CLERK, U.S. DISTRICT COURT<br>EASTERN DISTRICT OF CALIFORNIA |

United States of America
                                    )
v.                                  )          Case No.    2:21-mj-0151 DB
                                    )
Jesus CELAYA,                       )
Jose Luis RAMOS, and                )      **SEALED**
Luis MENDOZA                        )
                                    )

_____
_Defendant(s)_

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between on or about the date(s) of  9/13/2018 – 9/10/2021  in the county of  Sacramento  in the

  Eastern  District of  California , the defendant(s) violated:

| _Code Section_ | _Offense Description_ |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A) | Conspiracy to Distribute and Possess with Intent to Distribute a Controlled Substance. |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____
/s/ Laura Cuthbert
_Complainant's signature_

FBI Special Agent Laura Cuthbert
_Printed name and title_

Sworn to before me and signed telephonically.

Date:     09/20/21
_____

City and state:     Sacramento, California
_____
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

**AFFIDAVIT IN SUPPORT OF COMPLAINT AND SEARCH WARRANTS**

# Table of Contents

I.   AFFIANT'S TRAINING AND EXPERIENCE ................................................................... 1

II.  PURPOSE OF AFFIDAVIT ............................................................................................ 2

   A.  Complaints and Arrest Warrants ............................................................................. 2

   B.  Search Warrants ...................................................................................................... 2

      a.  4104 40th Avenue, Sacramento, CA (hereinafter referred to as CELAYA'S RESIDENCE, or
          TARGET LOCATION 1) which is further described in Attachment A-1. ....................................... 3

      b.  CELAYA'S telephone, 916-301-5403 (hereinafter referred to as CELAYA'S TELEPHONE),
          subscribed to Alberto Chavez, 4408 44th Avenue, Sacramento, CA, which is further described in
          Attachment A-2; ......................................................................................................... 3

      c.  CELAYA'S Red Chevrolet Silverado truck, CA license plate 61775S2, registered to CELAYA,
          (hereinafter referred to as CELAYA'S VEHICLE), which is further described in Attachment A-3; 3

III. BASIS FOR FACTS CONTAINED IN THIS AFFIDAVIT ................................................. 3

IV.  PROBABLE CAUSE ...................................................................................................... 6

   A.  Background ............................................................................................................. 6

   B.  Target Subjects' Criminal Histories, Roles in the DT, Residences and Phones ................... 7

      CELAYA: ................................................................................................................. 8

      RAMOS: ................................................................................................................... 8

      MENDOZA: .............................................................................................................. 8

   C.  Summary of Facts Supporting Probable Cause ..................................................................... 9

      CELAYA traveled to Riverside, CA, to meet with RAMOS to pick up 10 lbs. of methamphetamine
      on December 2, 2020 (Probable cause to arrest CELAYA and RAMOS, and to search CELAYA'S

RESIDENCE). ........................................................................................................... 11

Probable cause to believe CELAYA resides at CELAYA'S RESIDENCE/TARGET LOCATION 1
...................................................................................................................................... 27

Probable cause to believe CELAYA uses CELAYA'S TELEPHONE and continues to distribute
cocaine and methamphetamine ...................................................................................... 28

CELAYA delivers half pound of methamphetamine to Martinez on December 20, 2020 (Probable
cause to arrest CELAYA) ............................................................................................. 29

CHS-1 conducts a controlled two-pound methamphetamine buy from CELAYA and MENDOZA
on December 22, 2020 (Probable cause to arrest CELAYA and to search CELAYA'S
RESIDENCE/TARGET LOCATION 1) ....................................................................... 37

Additional Probable Cause to Support the Search of the Target Locations 1.
Evidence of Narcotics Trafficking Crimes is Likely to be Found at the Target Locations. ............. 44

**V.  SEARCH OF DIGITAL INFORMATION** ........................................................................ **48**

**VI. CONCLUSION** ........................................................................................................... **54**

**VII. REQUEST FOR SEALING** ....................................................................................... **55**

I, Laura Cuthbert, being duly sworn, declare as follows**:**

## I.      AFFIANT'S TRAINING AND EXPERIENCE

1.      I am a Special Agent with the FBI. I entered on duty at the FBI Academy in Quantico, Virginia, on January 22, 2006. I am currently assigned to the Sacramento Strike Force. I have been assigned to this squad since 2014.

2.      During the course of my employment as an FBI Special Agent, I have participated in numerous criminal investigations. I have also participated in numerous investigations involving the use of federal and state search warrants to collect evidence, including controlled substances, the seizure of narcotics-related records, and other types of evidence that document the activities of criminal organizations in both the manufacturing and distribution of controlled substances and weapons. To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources including physical and electronic surveillance, various types of infiltration (including undercover agents, informants, and confidential human sources), pen register and trap and trace devices, GPS and telephone tracking devices, trash covers, mail covers, pole cameras, stationary video recording vehicles, audio and audio/video recording devices.

3.      I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

4.      Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested complaint, search and arrest warrant, I have not included each and every fact known to me about this case. Rather, I have set forth only the facts that I believe are necessary to support probable cause.

5.      This affidavit is based upon my own personal knowledge and upon the knowledge of other law enforcement officers involved in this investigation.  Where I describe statements made by other

people (including other special agents and law enforcement officers), the statements are described in sum, substance, and relevant part. Similarly, where I describe information contained in reports and other documents or records in this affidavit, this information is described in sum, substance, and relevant part.

## II.    PURPOSE OF AFFIDAVIT

6.    This affidavit is intended to show that there is sufficient probable cause for the requested complaints, arrest warrants, and search warrants.  It does not purport to set forth all of my knowledge of the investigation in this matter.

### A.    Complaints and Arrest Warrants

7.    This affidavit is submitted in support of a request that a complaint and arrest warrant be issued for the following individuals:

   a.    Jesus CELAYA (CELAYA) for violations of 21 U.S.C. § 846, 841(a)(1), (b)(1)(A) (conspiracy to distribute and possess with intent to distribute a controlled substance).

   b.    Jose Luis RAMOS (RAMOS) for violations of U.S.C. § 846, 841(a)(1), (b)(1)(A) (conspiracy to distribute and possess with intent to distribute a controlled substance).

   c.    Luis MENDOZA (MENDOZA) for violations of U.S.C. § 846, 841(a)(1), (b)(1)(A) (conspiracy to distribute and possess with intent to distribute a controlled substance).

### B.    Search Warrants

8.    This affidavit is also submitted in support of search warrants for the following locations and vehicles, which are further described below and in **Attachments A-1** through **A-3** (hereby incorporated), and which are collectively referred to as **Target Locations 1-3**.

9.    It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators with whom I have spoken, that the items listed in **Attachment B**, which is incorporated into this affidavit by reference, are items most often associated with the

2

trafficking and distribution of controlled substances, as well as the proceeds from such illegal operations.

10.     The **Target Locations 1-3** are described below and are believed to contain evidence, fruits, and instrumentalities of the following crimes, as those items are set forth in **Attachment B** (hereby incorporated): **21 U.S.C. § 846, 841(a)(1), (b)(1)(A) (conspiracy to distribute and possess with intent to distribute a controlled substance);** and **21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of a controlled substance)**.

   a.      4104 40th Avenue, Sacramento, CA **(hereinafter referred to as CELAYA'S RESIDENCE, or TARGET LOCATION 1)** which is further described in **Attachment A-1.**

   b.      CELAYA'S telephone, 916-301-5403 **(hereinafter referred to as CELAYA'S TELEPHONE),** subscribed to Alberto Chavez, 4408 44th Avenue, Sacramento, CA, which is further described in **Attachment A-2;**

   **c.**      CELAYA'S Red Chevrolet Silverado truck, CA license plate 61775S2, registered to CELAYA,  **(hereinafter referred to as CELAYA'S VEHICLE), w**hich is further described in **Attachment A-3;**

   **III.          BASIS FOR FACTS CONTAINED IN THIS AFFIDAVIT**

11.     I am familiar with the facts and circumstances described herein and make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

   a.      My training and experience investigating narcotics traffickers and firearms traffickers, which includes my discussions with more experienced narcotics investigators;

/ / /

/ / /

3

b.      Oral and written reports about this investigation and other investigations, which I have received from other members of the FBI as well as other federal agents and state law enforcement agencies;

c.      Oral and written reports about this investigation and other investigations which I have received from other members of the FBI, as well as other law enforcement agencies in this and other investigations which have been reported to me either directly or indirectly;

d.      Intercepted communications made pursuant to prior court orders;

e.      Confidential Human Source (CHS) statements;

f.      Pen register and trap and trace information, telephone toll records, and subscriber information;

g.      Court authorized geolocation information for various phones;

h.      Public records;

i.      Law enforcement databases; and

j.      Evidence gathered through other law enforcement investigations.

12.     Except as otherwise noted, when I assert that a statement was made, the information was provided by an FBI agent, another law enforcement officer, an intelligence analyst, or a source of information (who may have had either direct of hearsay knowledge of the statement), with whom I have spoken or whose reports or statements I have reviewed. Likewise, information resulting from surveillance, except where otherwise indicated, does not necessarily set forth my own observations but rather has been provided directly or indirectly to me by other law enforcement officers who conducted such surveillance.

13.     References are made throughout this affidavit to records and/or criminal records.  Whenever such reference is made, the sources consulted and referred to consist of one or more of the following sources of information:  California Justice Information System (CJIS), Cal-Photo,

California Department of Motor Vehicles (CA DMV), California Law Enforcement Telecommunications System (CLETS), and California Highway Patrol (CHP) (hereinafter, these sources of information will be generically referred to as the "Record").

14.     Unless otherwise noted, wherever in this affidavit I assert that a statement was made by an individual, such statement is described in substance herein, and is not intended to be a verbatim recitation of such statement.  Furthermore, any statements excerpted from recorded conversations, including those that are quoted, are subject to further revision for clarification and/or accuracy.  The summaries of intercepted communications in this affidavit are based on preliminary summary translations prepared by wiretap monitors/translators.  To the extent quotations are used in the descriptions below, the quoted segments are based on line sheets and reviews of recordings, and not final or certified transcripts.  In addition, all dates and times are approximate and based on the monitoring equipment at the time the communication was intercepted.  Unless a transcript or portion thereof is referenced in this Affidavit, the calls used are summaries of the pertinent portion of those calls and interpretation of sometimes vague and/or coded language.  Not all relevant intercepted communications are described and not all relevant portions of mentioned communications have been described.  Unless otherwise noted, the intercepted communications occurred in Spanish and were translated into English by the wiretap monitors.

15.     Discussions of particular intercepted communications include a reference to the Target Telephone on which the communications were intercepted, indicated by "TT" followed by the number of the telephone, as well as the unique session number assigned to the communication by the monitoring equipment.  For instance, the first intercepted communication over Target Telephone #1 would be referenced as "TT#1, Call 1."

/ /

16.    With quotations of communications, brackets are used for the following purposes:  the use of "[UI]" indicates that word or words were unintelligible and thus could not be translated, and the use of the "[OV]" indicates that the parties to a call were talking over one another and thus some words could not be heard.  A phonetic spelling of a word that could be translated is indicated with "[PH]".  Brackets are also used to protect the identifying information of persons not named as defendants, as well as to provide certain contextual information, e.g., explain which defendant is being referenced when a nickname is used by another co-conspirator to refer to that defendant.

17.    This affidavit is being submitted for the limited purpose of seeking authorization for the above-referenced complaints, arrest warrants, and search warrants.  Therefore, I have not set forth every fact learned during the course of this investigation.  Facts not set forth herein are not relied upon in reaching my conclusion that a warrant should be issued.

## IV.    PROBABLE CAUSE

### A.    Background

18.    The FBI, as part of a multi-agency task force which includes the DEA, has been conducting an undercover investigation, Operation Banda Brothers, focusing on Colombian and Mexican cartels' drug trafficking and money laundering activities through music promotion and related businesses in the Sacramento area since September 2017. Members of the investigative team identified **CELAYA** as methamphetamine and heroin trafficker. Investigators continued the investigation of the DTO involving **CELAYA**, **RAMOS**, **MENDOZA**, Marco ANGUIANO, Jesus MARTINEZ, and Alma PITA-Fuentes.

/ / /

/ / /

19.    During the course of the investigation, the FBI conducted controlled methamphetamine

purchases using CHS-1[1], CHS-2[2], and an undercover employee (UCE), consensually-recorded

calls utilizing CHS-1, received court authorization to wiretap a phone and a Facebook account,

obtained court authorized geolocation information for various phones, numerous pen registers,

and employed other various investigative techniques targeting the DTO. During the course of the

investigation, investigators seized two kilograms of methamphetamine. On November 23, 2020,

investigators obtained authorization to intercept wire and electronic communications for one

phone (916-602-7738 and later 725-207-4311,[3] **Target Telephone 1**, hereinafter **TT1**) and one

Facebook account (**Target Account 1,** hereinafter **TA1**) used by **CELAYA**.

   **B.    Target Subjects' Criminal Histories, Roles in the DT, Residences and Phones**

20.    In addition to a description of the Target Subject's criminal history and role in the DTO, each of

the Target Subject paragraphs below set forth probable cause to believe that the Target Subjects

reside at, or otherwise store evidence of crimes at, the locations for which I am requesting search

warrants.

21.    The targets listed below have been identified from the following information sources and

criminal indices: the CA DMV, CLETS, the National Crime Information Center (NCIC), DEA,

FBI, physical surveillance, conversations with other agents and officers participating in the

---

[1]  CHS-1 was opened as a confidential human source in January 2018.  CHS-1 has previously provided reliable information in multiple different ongoing investigations.  CHS-1's criminal history includes a September 2013 conviction on a misdemeanor petty theft and providing false citizenship paperwork, for which CHS-1 was charged with 36-month probation, a fine and 37 days in jail.  Much of the information CHS-1 had provided has been corroborated by law enforcement.  CHS-1 began working for the FBI in hopes of monetary compensation. Based on my interactions with CHS-1 throughout this case, I believe CHS-1 to be reliable and credible.

[2]  CHS-2 was opened as a confidential human source in March 2018.  CHS-2 has previously provided reliable, corroborated information in multiple different ongoing investigations.  CHS-2 has a 2014 charge of Possession with Intent to Distribute Methamphetamine, which was dismissed due to cooperation with law enforcement in 2018. Since that time, CHS-2 has been working for the FBI in hopes of monetary compensation.  Much of the information CHS-2 had provided has been corroborated by law enforcement. Based on my interactions with CHS-2 throughout this case, I believe CHS-2 to be reliable and credible.

[3] TT1 changed mobile directory numbers during the 30-day interception period, and the new number was intercepted pursuant to the continuation provisions in the T-III order.

investigation, and my own participation in the investigation. Please see Additional Probable Cause to Support the Search of the **SUBJECT PREMISES** for some additional information regarding **SUBJECT PREMISES**.

**CELAYA:**

    **CELAYA** has been identified as a methamphetamine distributor based on controlled purchases of methamphetamine from **CELAYA** by CHS-1, CHS-2 and the UCE, and intelligence gained those controlled purchases, and during wiretap intercepts.

    <u>Known Aliases</u>: Chuey and Jesus A. **CELAYA**

    <u>Criminal History</u>: **CELAYA** has no known criminal history.

    <u>Residence:</u> As discussed in more detail below, **CELAYA**'S residence has been identified through physical surveillance as **4104 40th Avenue, Sacramento, CA** (**CELAYA'S RESIDENCE/TARGET LOCATION 1**).

**RAMOS:**

    **RAMOS** has been identified as a methamphetamine distributor and load coordinator based on court authorized intercepted communications.

    <u>Known Aliases:</u> Jose Luis Ramos, Jose Luis Ramos Vrena, and Jose Luis Ramos Urena

    <u>Criminal History</u>: **RAMOS** was convicted of a felony for CA Health and Safety Code 11352 in 1994 in Los Angeles, CA. **RAMOS** was also arrested and detained for a DUI in Sacramento in 2008.

**MENDOZA:**

    **MENDOZA** has been identified as a methamphetamine distributor and a facilitator for **CELAYA**, based on physical surveillance, a controlled drug purchase with CHS-1, and court authorized intercepted communications.

    Known Aliases: None

<u>Criminal History</u>: **MENDOZA** has no known criminal history for narcotics related activity, but has been arrested for a DUI in 2005.

**C.**   **Summary of Facts Supporting Probable Cause**

***1.***   ***UCE, CHS-1, and CHS-2 Purchased One Kilogram of Methamphetamine from CELAYA – September 13, 2018 (Probable Cause to Arrest CELAYA and to search CELAYA'S RESIDENCE, or TARGET LOCATION 1)***

22.   On September 13, 2018, FBI investigators coordinated and conducted an undercover operation where a controlled purchase was made of approximately one kilogram of methamphetamine between UCE, CHS-1, CHS-2 and **CELAYA** in a vehicle outside of Chando's Cantina at 805 15th Street, Sacramento, CA. Law enforcement conducted surveillance before, during and after the operation and maintained communication with the UCE and both the CHS. The UCE, CHS-1, and CHS-2 were all equipped with recording devices and were debriefed by law enforcement following the meet.

23.   Between August 3-4, 2018, **CELAYA** and CHS-1 communicated via text on Instagram (jesusc861) where **CELAYA** told CHS-1 he had picked up "salt" in Los Angeles. CHS-1 asked what CELEYA was charging. **CELAYA** then contacted CHS-1 via telephone number 916-284-8527, and advised he was selling methamphetamine at $3,000 per pound of not so great quality and $3,800 a pound of money back guarantee quality. The call was not recorded, but was reported by CHS-1 following the call. On August 8, 2018, CHS-1 met with **CELAYA** in-person, and he told CHS-1 he would be traveling to Los Angeles the following day to look at some cocaine that had been delivered. **CELAYA** also said he was sure he would be bringing back some methamphetamine. **CELAYA** then told CHS-1 he had heroin available to sell to UCE, if UCE was interested. This meeting was not recorded or monitored.

24.   On September 9, 2018, CHS-2 met **CELAYA** at Chando's Cantina. **CELAYA** told CHS-2 he could sell methamphetamine to CHS-2 and they agreed to talk at another time. The meet was not

recorded. On September 12, 2018, CHS-1 contacted **CELAYA** on telephone number 916-284-8527 to request a price for "la muchachona" which was code for a kilogram of methamphetamine. **CELAYA** responded that they should talk in person the following day to which they both agreed to meet at Chando's Cantina at 8pm.

25. On September 13, 2018, agents established surveillance in the area of Chando's Cantina, 805 15th Street, Sacramento, CA, at approximately 8:00 p.m. UCE, CHS-1 and CHS-2 all went to Chando's Cantina. **CELAYA** contacted CHS-1 and said he was waiting to get a ride to Chando's Cantina. At approximately 11:25 p.m., **CELAYA** contacted CHS-1 and advised he was outside of Chando's Cantina and did not want to go inside. Surveillance identified a silver sedan bearing CA license plate 8APL639 parked in front of Chando's Cantina. Shortly thereafter, surveillance observed UCE, CHS-1 and CHS-2 enter the same silver sedan occupied by a female driver and **CELAYA**. Surveillance observed the vehicle pull away and drive around the block.

26. The meeting with **CELAYA** was audio and video recorded. Inside the vehicle **CELAYA** placed a bag of methamphetamine in the center of the front seats where CHS-2 and **CELAYA** talked about the quality of the methamphetamine, including an option to return it to **CELAYA** if it was not good. UCE provided **CELAYA** $3,500 and **CELAYA** passed the package to CHS-1 who handed it to UCE. UCE, CHS-1 and CHS-2 exited the vehicle, stored the methamphetamine in a safe area under FBI surveillance and returned to Chando's Cantina.

27. After the operation, law enforcement personnel met with UCE, CHS-1 and CHS-2 at a pre-determined location. At that time, law enforcement personnel retrieved the recording devices from the UCE, CHS-1 and CHS-2 as well as the suspected methamphetamine.

28. The suspected methamphetamine has been sent to the DEA lab for analysis. Based on my training, experience, knowledge of this investigation, and the circumstances of the transaction, I believe the substance collected to be methamphetamine.

> **2.**      ***CELAYA traveled to Riverside, CA, to meet with RAMOS to pick up 10 lbs. of methamphetamine on December 2, 2020 (Probable cause to arrest CELAYA and RAMOS, and to search CELAYA'S RESIDENCE).***

29.     Between November 23, 2020 and December 5, 2020, **CELAYA**, via TT1, and **RAMOS**, via 52-664-568-9152 (hereinafter MX-9152), exchanged 32 phone calls and eight text messages coordinating the purchase of ten (10) pounds methamphetamine from ESPARZA.

30.     On November 23, 2020 at 1:45 p.m., **CELAYA**, via TTI, called **RAMOS**, via MX-9152 (Call No. 14). After greeting, **RAMOS** said that he called in case "he," referencing a third party (hereinafter "UM-1"), had left. **CELAYA** stated that UM-1 had not left, because UM-2 did not start working until 4:00 p.m. **RAMOS** believed that UM-1 had already arrived at **CELAYA's** location because UM-1 had previously told RAMOS that UM-1 was going to leave early. **CELAYA** then told **RAMOS** that he had told UM-1 not to leave until 4:00 p.m. **RAMOS** stated that if **CELAYA** had not told UM-1 not to leave, **RAMOS** was going to ask **CELAYA** for UM-1's phone number to find out why UM-1 had not left yet. **CELAYA** believed UM-1 was not going to leave until between 4:00-4:30 p.m.

31.      On November 28, 2020, **RAMOS**, via MX-9152, called **CELAYA**, via TT1 (Call No. 272). During the conversation, **CELAYA** and **RAMOS** discussed the purchase of twenty pounds of methamphetamine. The cost of the methamphetamine was $1,600 per pound or $3,200 per kilogram. If they purchased twenty pounds, they (both **CELAYA** and **RAMOS**) would make $800 each per pound, which would make it worth buying. **RAMOS** also told **CELAYA** that he needed a few days because he had a lot of "cosas" (translation: "things") he had to take care of. The following is a transcript of a segment of the conversation:

| Sender | Message Sent | Translation from Spanish to English |
|--------|--------------|-------------------------------------|
| **RAMOS** | Sí, por eso, por eso no le hablé ese día, oiga, pa' decirle. ¿Porque ya ve que fue el mero día de *Thanksgiving?* | Yeah, that's why, that's why I did not call you that day, man, to tell you. Because you see, it was right on Thanksgiving Day? |

| CELAYA | Ajá, simón. [Al fondo: ruido de carro] | Uh-huh, yeah. [Background: car noises] |
|---|---|---|
| RAMOS | Ey. Y ya, y ya le dije, le dije "¿Ey, si quieres?" le dije.  Le dije "¿Quieres?".  Se lo puse a cuatro y medio (4 ½), le dije.  "¡Nooo, bájale, bájale!"  Le dije "'Ira vale, asi me dijeron."  Le dije *Okay*, ¿Dime cuantos vas a querer? | Yeah, and I, and I told him, and I told him, "Hey, do you want some?" I said. I said "Want some?". I told him for four and a half (4 ½). I told him. "Nooo, drop it, drop it!" I told him, "Look man, that is what they told me." I said, "Okay, tell me how many do you want? |
| CELAYA | Ajá. | Uh-huh. |
| RAMOS | Le dije "¿Dime cuantos vas a querer?  Pa' yo, yo a según a cómo tú me digas, cuantos me digas", yo les digo a aquellos vales "sabes que…".  Porque me dijo "¡No, pos' diles que a cuatro (4)!"  Le dije "No, pos', um, no checa", le dije.  Le dije "*Okay*…".  Y ya le dije "¿*Okay*, de cuantos vas a, 'tamos hablando? | I told him "Tell me how many do you want? So that I, depending on what you tell me, how many you tell me", I'll tell those guys "you know what" …". Because he told me "No, well, tell them that at four (4)!" I told him, "No, well, uh, that it's not worth it.", I said, I said "Okay…". And then I said "Okay, how many a... are we talking aboout?" |
| CELAYA | Ajá. | Uh-huh. |
| RAMOS | No, dice que de veinte (20), enteros. | No, he said twenty (20), whole ones. |
| CELAYA | ¡Oh!  ¿Veinte (20)?  Órale, entonces… | Oh! Twenty (20)? All right, then… |
|  | [Interposición de voces] | [Voices overlap] |
| RAMOS | Le dije "¡Ah … | I said "Ah… |
|  | [Interposición de voces] | [Voices overlap] |
| CELAYA | … está bien. | …. that's fine. |
| RAMOS | Le dije "entonces, enton", así cómo me dijo. Le dije "¿Sábes que?  Entonces sí, ya conviene." | I told him "So then, so then, just like you told me.  I told him "You know what? For those many, then it is worth it." |
| CELAYA | Sí, pos' sí … | Yeah, yeah… |
|  | [Interposición de voces] | [Voices overlap] |
| RAMOS | Oiga … | Look… |
| CELAYA | … ya les digo a aquellos güeyes. | … I can tell those dudes. |

| RAMOS | Oiga, que le, que, que nos den así, así como dijo mil seiscientos (1,600) … | Look, to have it, to have it given to us just like he said at one thousand six-hundred (1,600) … |
|---|---|---|
| CELAYA | Ajá. | Uh-huh. |
| RAMOS | … la "Ele" [PH], que vienen saliendo, ¿Cuántos? El entero, vienen saliendo ¿Qué? | …for the "L", that ends up being, how much? The whole one ends up being, what? |
| CELAYA | Cómo en tres (3) doscientos (200). | Like at three (3) two hundred (200). |
| RAMOS | Tres (3) doscientos (200). ¿Ochocientos (800) que nos chinguemos? | Three (3) two hundred (200). We can profit eight hundred (800)? |
| CELAYA | Si, pos' sí. | Yeah, yeah. |
| RAMOS | Ya pa' los dos (2) …Ya, ya aguanta, de cada uno. | For the two (2) of us …there would be plenty for each one. |
| CELAYA | Si, pos' si, ya. | Yeah, yeah. |
| RAMOS | Sí ¿Imagínate, quince (15) o veinte (20)?  [I/I] es un buen, un buen-le dije "'Ira, órale pues, así, yo creo que sí", le dije. "Ah, pos' dame chanza pa…".  Le dije, "pa' cuando estés…", "No, dame chanza uno, unos días más, porque ya viene toda esta madre", dice. ¡Valiendo verga! | Yeah, think about it, fifteen (15) or twenty (20)? [U/I] it's a good, it's a good…I said "Look, all right then, like that, I think like that it's a yes". I said "Oh, well, give me some time so when you are ready…", "No, give me some time, a few, a few more days, because of all this shit is coming," he said.  "Well, fuck!" |
| CELAYA | Órale. | Alright. |
| RAMOS | Y cómo tiene el "papel", dijo "hay tengo el "papel", yo no voy a andar que, que, que 'perame con el papel y eso.  Yo, en cuánto me digas, hay 'ta el "papel", y hay 'ta eso, nomás que 'te bueno." | And since he has the "paper", he said "I have the "paper", and I'm not going to be like, like, like wait for the "paper" and that.  For me, as soon as you tell me, here is the "paper", and that's it, as long as it is good. |
| CELAYA | Simón. | Yeah. |
| RAMOS | Ey. Umjú.  ¿Cómo ve? | Yeah, um-hum.  What do you think? |
| CELAYA | No, pos' si, pos' le hablé al camarada y le dije que si, que si se habían metido … | Yeah, yeah, I called the guy and I asked him, if they, if they had brought… |
| RAMOS | Ajá. | Uh-huh. |
| CELAYA | Y, y dijo "No, ¿Sabes qué?" dice, "no nos metimos porque se nos había olvidado que era día | And, and he said "No, you know what?", he says "We did not cross because we forgot it was that one |

| | de esa madre". Dice "y pos' el *raitero* no quiere chambear, que quiere estar con la familia." | holiday". He says "and the *raitero* does not want to work because he wants to be with the family. |
|---|---|---|

32.     On December 1, 2020, in the afternoon, **CELAYA**, via TA1, began messaging multiple females in an attempt to have one of them travel with him to Los Angeles. Between 5:58 p.m. and 6:12 p.m., **CELAYA**, via TA1, and an individual named Pita, via user ID 100011159375559 (hereinafter "FB-5559"), exchanged the following conversation:

| Sender | Message Sent | Translation |
|---|---|---|
| **CELAYA** 5:58 p.m. | Wyd | What are you doing? |
| PITA 5:58 p.m. | None and you | |
| **CELAYA** 5:58 p.m. | I got a job for you. | |
| **CELAYA** 5:59 p.m. | *Alma missed your call.* | |
| PITA 6:00 p.m. | What kind of job | |
| **CELAYA** 6:00 p.m. | *Alma missed your call.* | |
| **CELAYA** 6:01 p.m. | I need a ride and I'll give you 500 | |
| PITA 6:01 p.m. | Where? | |
| PITA 6:04 p.m. | 😊 | |
| **CELAYA** 6:05 p.m. | To LA | |
| PITA 6:05 p.m. | When? | |
| **CELAYA** 6:06 p.m. | Right now and will be back like at 4am, I'll drive | |

| PITA 6:08 p.m. | Is your gf coming too??? And I can but not rn i ma go do something real quick. | Is your girlfriend coming too? And I can but not right now, I'm going to do something real quick. |
| **CELAYA** 6:10 p.m. | She doesn't want to I told her | |
| PITA 6:12 p.m. | Let me convince her to come with us. | |

33.     On December 1, 2020, at 6:43 p.m., **RAMOS**, via MX-9152, called **CELAYA**, via TT1 (Call No. 436). During part of the conversation, **RAMOS** asked if **CELAYA** was going to come early tomorrow [to Southern California area]. **CELAYA** said that the girl wanted to leave tonight, so they could get rest and come back early the next day. **CELAYA** said they could get there by 2:00 [a.m.], grab a hotel and be back [to Sacramento] by mid-day. At the end of the call when **CELAYA** was hanging up, **RAMOS** was overheard saying "Hello" on what was likely a second phone.

34.     Between 10:07 p.m., and December 2, 2020 at 7:02 a.m., **CELAYA**, via TA1, and Pita, via FB-5559, exchanged the following conversation:

| Sender | Message Sent | Translation |
|---|---|---|
| **CELAYA** 10:07 p.m. | Are you done? | |
| PITA 10:08 p.m. | Yes | |
| PITA 10:19 p.m. | *Alma joined the video chat.[4]* | |
| PITA 10:20 p.m. | *Alma joined the video chat.* | |
| **CELAYA** 10:20 p.m. | *You joined the video chat.* | |
| **CELAYA** | *You started the video chat.* | |

[4]  Based on the TIII information provided by Facebook, **CELAYA** and PITA joined a video chat that was initiated by Facebook username "Yaelyn Rodriguez," who is known to investigators as **CELAYA's** girlfriend.

| | | |
|---|---|---|
| 10:21 p.m. | | |
| **CELAYA** 10:21 p.m. | *You joined the video chat* | |
| PITA 10:21 p.m. | *Alma joined the video chat.* | |
| **CELAYA** 10:25 p.m. | The video chat ended. / Missed [False]/ Duration [224] | |
| **CELAYA** 06:15 a.m. 12/02/20 | Wake up | Wake up. |
| **CELAYA** 06:28 a.m. | *Alma missed your call.* | |
| **CELAYA** 06:37 a.m. | *Alma missed your call.* | |
| **CELAYA** 06:50 a.m. | *Alma missed your call.* | |
| **CELAYA** 07:01 a.m. | You called Alma. / Missed [False]/ Duration [23]. | |
| **CELAYA** 07:01 a.m. | 4104 40th [**CELAYA'S RESIDENCE/TARGET LOCATION 1**]. | |
| PITA 07:02 a.m. | Be there in 10 min | |
| PITA 7:02 a.m. | Here. | |

35.    Based on geolocation data of TT1, **CELAYA** was at **CELAYA'S RESIDENCE** at 7:12 a.m.,

10 minutes after Pita messaged **CELAYA** that she was "here." The Geolocation data received

/ / /

16

between 7:27 a.m. and 2:00 p.m. confirmed **CELAYA** traveled from the Sacramento, CA area to the Southern California area via Highway 99.

36.     On December 2, 2020 at 9:20 a.m. (Call No 453), **CELAYA,** via TT1, called **RAMOS,** via MX-9152. The following is a transcript of the conversation:

| Sender | Message Sent | Translation from Spanish to English |
|--------|--------------|--------------------------------------|
| RAMOS | Bueno. | Hello. |
| CELAYA | Buenos días. | Good morning. |
| RAMOS | Buenos días, viejón. | Good morning, man. |
| CELAYA | ¿Cómo anda? | How are you? |
| RAMOS | Aquí mire, aquí mire.  ¿Y usted? | Just here, just here.  And you? |
| CELAYA | Aquí en la carretera. | Here, on the road. |
| RAMOS | ¿Ya mero llega? | Are you almost here? |
| CELAYA | Si, a todavía ando lejillos. | Yeah, I am still a little way out. |
| RAMOS | [Escupe] ¿O, sí? O— | [Spits] Oh, yeah?  Oh— |
|  | [Interposición de voces] | [Voices overlap] |
| CELAYA | Simón, ey. | Of course, yeah. |
| RAMOS | —[I/I] Pensé que usted ya andaba llegando. | —[U/I] I thought you would almost be here. |
| CELAYA | No. | No. |
| RAMOS | [Carraspea] | [Clears throat] |
| CELAYA | No, se me hizo tarde. [Risitas] Este— | No, I was running late.  [Chuckles] Uhm— |
|  | [Interposición de voces] | [Voices overlap] |
| RAMOS | [Escupe] | [Spits] |
| CELAYA | Voy a legar allí como a la una (1:00). Ey, una (1:00), una y media (1:30). | I will get there like at one (1:00).  Yeah. one (1:00, one thirty (1:30). |
| RAMOS | O, okey, esta bien. | Oh, okay, it's all right. |
| CELAYA | Este, allí le marco cuando ande mas cercas. | Uhm, I Will call you once I am closer. |
| RAMOS | [I/I] Ándele pues, con cuidado— | [U/I] All right then, be careful. |

17

| | [Interposición de voces] | [Voices overlap] |
|---|---|---|
| **CELAYA** | Sale. | Cool. |
| **RAMOS** | [I/I]. | [U/I]. |
| **CELAYA** | [I/I]. | [U/I]. |
| **RAMOS** | Okey, *bye*. | Okay, bye. |

37.     At 2:00 p.m., **CELAYA**, via TT1, called **RAMOS,** via MX-9152 (Call No. 506). The following

is a transcript of the conversation:

| Sender | Message Sent | Translation from Spanish to English |
|---|---|---|
| **CELAYA** | [Aside: Oiga, oiga aquí estoy este, como a cinco minutos de con Angel.  Le sigo derecho, ¿eda?] | [Aside: hey, hey I am here like five minutes from Angel.  I go straight, right?] |
| **RAMOS** | Bueno. | Hello? |
| **CELAYA** | [Aside: Si por [U/I], okay.] | [Aside: Yeah but [U/I], okay.] |
| **RAMOS** | Alo,  Alo. | Hello, hello. |
| **CELAYA** | ¿En qué salida más o menos me salgo? | Around what exit do I get off on.? |
| **RAMOS** | Si, si pos ahí dice Santa Ana. | Yeah, yeah well it says there Santa Ana. |
| **CELAYA** | Okay. | Okay. |
| **RAMOS** | Si, Santa Ana y Santa Ana, si. ¿eh?  Ahorita— | Yeah, Santa Ana and Santa Ana, yeah, okay? Right now— |
| **CELAYA** | Okay, órale pues. | Okay, alright dude. |
| **RAMOS** | Deje, deje le hablo pa a ver si es pa Riverside. Pa moverlo pa Riverside pa que se baje a Riverside. Porque si es pa Riverside va agarrar él, va agarrar el noventa uno… | Let, let me call to see if it is towards Riverside. That way I can move you towards Riverside and you can go down to Riverside. If it is to Riverside you, you will have to take the ninety-one. |

38.     Between approximately 2:00 p.m. and 3:30 p.m., FBI Special Agent (SA) Manuel Rodriguez, SA

Tsoler Kojayan, SA Dawntea Cross, and FBI Task Force Officers (TFO) Rickey Cardona and

Kevan Beard attempted to locate **CELAYA** and Pita based on geolocation data of TT1 and

x5386.

18

39. At approximately 3:14 p.m., when x5386 was located near the America's Best Value Inn, 4045 University Ave, Riverside, CA, **CELAYA**, via TT1 called **RAMOS,** via MX-9152 (Call No. 522). The following is a transcript of the conversation:

| Sender | Message Sent | Translation from Spanish to English |
|---|---|---|
| **RAMOS** | ¿Bueno? | Hello? |
| **CELAYA** | Ey, mira aquí ando en el Downtown, para ya comer. | Yeah, look I am here in Downtown, so we can eat already. |
| **RAMOS** | ¿O en el Downtown? | In Downtown? |
| **CELAYA** | De, de, de— | At, at, at— |
| **RAMOS** | Mira, bájate acá en la… ¿Cómo se llama?  Ahí, ahí en La Sierra en una tienda, ahorita voy pa allá.  Apenas voy yo pa allá. | Look, get off on… What's it called? There, there on La Sierra at a store and right now I'll go over there. I am barely going over there. |
| **CELAYA** | Oh, okey si porque ya estoy aquí en el Downtown the Riverside. | Oh, okay yeah because I am already here in Downtown Riverside. |
| **RAMOS** | Okey, ¿ahí, ahí está una *mall* en La Sierra, no?  ¿Qué es? | Okay, there, there is a mall on La Sierra, right?  What is there? |
| **CELAYA** | No, ¿por qué? | No, why? |
| **RAMOS** | O acá en la, en la McKinley. Una, una, una, una *mall*, ¿no? | Or it's over here on, on McKinley. There is a, a, a mall, right? |
| **CELAYA** | Pos no se, buey. Yo aquí me pare en una que se llama La Maxi que esta—una tienda que se llama mari—Maxi Foods. | Well, I don't know, dude.  I stopped at a place called La Maxi and it—a store that is called mari—Maxi Foods. |
| **RAMOS** | Oh, ¿pero no son, no son mall o tienda? | Oh, but it is a store and not, not a mall? |
| **CELAYA** | No, no es *mall.* Estuve en una calle que se llama— | No, it's not a mall.  I was on a street that was named— |
| **RAMOS** | Okey, ahorita voy pa allá. | Okay, I will go over there right now. |
| **CELAYA** | La, la Brocktock o algo así. | Brockstock or something like that. |
| **RAMOS** | Oh, okey.   Ahorita voy pa allá, voy pa allá. | Oh, okay.  I'll go right now, I am already heading that way. |
| **CELAYA** | Okay, sale pues. | Okay, alright then. |

| | | |
|---|---|---|
| **RAMOS** | Okay, ya voy aquí, no duro mucho, *bye*. | Okay, I am on the way, I will not take long, bye. |
| **CELAYA** | Okey, *bye*. | Okay, bye. |

The surveillance team arrived in the area a few minutes later. At 3:30 p.m., TFO Cardona went into the Mariscos Ixtapa Restaurant located next door to the hotel. TFO Cardona observed Pita and **CELAYA** sitting on the patio at the restaurant. Pita was wearing a red shirt and baseball hat. **CELAYA** was in a grey shirt. TFO Cardona then went to the parking lot and obtained the license plates of the vehicles in the lot. One of the vehicles parked in the parking lot behind the restaurant was a silver Honda minivan, bearing CA license plate 5SPE960 (hereinafter Pita's vehicle**)** which is registered to Pedro Pita Oregon, 4200 Iowa Ave, Sacramento, CA. Photographs were taken of the vehicle.

40.    At approximately 4:02 p.m., **RAMOS**, via MX-9152, called **CELAYA**, via TT1 (Call No. 530). The following is a transcript of the conversation:

| Sender | Message Sent | Translation from Spanish to English |
|---|---|---|
| **CELAYA** | Bueno. | Hello. |
| **RAMOS** | Viejón, aquí voy pa allá, ¿eh? Aquí voy, nomás que me agarro el puto tráfico. | Dude, I am heading that way, okay? I'm on the way, it's just that I got fucking traffic. |
| **CELAYA** | Orale, ya dijo . | Okay, you said it. |
| **RAMOS** | En este, en este pinche [I/I] se agarra el tráfico grande. Nomás que con mi jefa [I/I] un mandado a llevarla y la lleve. | On this, on this fucking [U/I] the traffic is bad.  It's just I was with my mom [U/I]  on an errand and I ended up taking her. |
| **CELAYA** | Ey. | Yeah. |
| **RAMOS** | Y ey me tarde más. | And I ended up taking a while. |
| **CELAYA** | Orale. | Okay. |
| **RAMOS** | Si y ¿oye si saco las placas de la troca? | Yeah and did you get the registration for the truck? |
| **CELAYA** | No, me vine con una amiga. | No, I came with a friend. |
| **RAMOS** | ¿Oh si? Okey, ahorita, ahorita llego entonces. | Oh yeah?  Okay, I will be there shortly. |
| **CELAYA** | Oh, orale pues. | Oh, alright then. |
| **RAMOS** | Ahí [I/I], ey aquí voy aquí | There [U/I], yeah and I am almost |

|  | | casi llegando al setenta uno (71). | arriving to the seventy-one (71). |
|---|---|---|---|
| **CELAYA** | | Okey, sale pues. | Okay, alright. |
| **RAMOS** | | Chido, bye, bye. | Cool, bye, bye. |

41.    Two minutes later, **RAMOS**, via MX-9152, called **CELAYA**, via TT1 (Call No. 532). During



the brief conversation, **RAMOS** told **CELAYA** that he was stuck in traffic and wanted

**CELAYA** to travel to meet **RAMOS** at a mall or store near Highway 91 and McKinley or Pierce

Road. **CELAYA** told **RAMOS** that he would look for Pierce.

42.    At approximately 4:23 p.m., SA Rodriguez observed **CELAYA** and Pita exit the restaurant and

enter Pita's **VEHICLE**. Photographs were taken of **CELAYA** and Pita exiting the restaurant.

43.     At approximately 4:39 pm., **RAMOS**, via MX-9152, called **CELAYA**, via TT1 (Call No. 534).

The following is a transcript of the conversation:

| Sender | Message Sent | Translation from Spanish to English |
|---|---|---|
| **CELAYA** | Bueno. | Hello. |
| **RAMOS** | Ey, ¿qué onda viejon? ¿Dónde anda? | Yeah, what's up, dude?  Where are you? |
| **CELAYA** | Aquí, donde mismo. | Here, at the same place. |
| **RAMOS** | Ah, no, vengase acá en la, en la Pierce. Aquí, aquí donde esta una | Ah, no, come over here, over here on Pierce. Here, here at a gas station, it is a seventy-six (76). |

| | | | |
|---|---|---|---|
| | gasolinera, una setenta seis (76). | |
| CELAYA | Oh, okey. | Oh, okay. |
| RAMOS | ¿Te acuerdas que le dije? Agarre, agarre… ¿Dónde está usted? | Do you remember when I told you?  Get, get… Where are you? |
| CELAYA | Estoy de ahí, de ahí donde la calle esta, esta como a quince (15) minutos, veinte (20). | From where I am to where that street is, it, it is about fifteen (15) or twenty minutes away. |
| RAMOS | Vengase aquí.  Ah, cabrón, ¿pos dónde anda?  ¿Tan lejos? | Come over here.  Oh, fuck, where are you?  Are you that far? |
| CELAYA | Si, estoy luego, luego en la—donde está el, el… ¿Qué es, el setenta (60)? | Yeah, I am right here, right her on—where the, the… What is it, the sixty (60)? |
| RAMOS | Oh, ¿estas allá? No pos vengase pa acá.  [I/I] antes de pasar el quince (15), dos calles antes de pasar el quince(15)—dos (2) bajadas. | Oh, you are over there?  No, come over here. [U/I] once you pass fifteen (15), two (2) streets before passing fifteen (15)— two (2) exits. |
| CELAYA | Aja. | Uh-huh. |
| RAMOS | Esta la Pierce. | Is going to be Pierce. |
| CELAYA | Okey. | Okay. |
| RAMOS | Aquí dele y luego, luego a mano derecha a— viniendo usted de allá pa acá le va dar a la derecha y va mirar una setenasteis (76). | Go there and then right, right away turn right and—come from where you are this way you are going to turn right, and you are going to see a seventy-six (76). |

44.    At approximately 4:41 p.m., surveillance observed **CELAYA** and Pita depart in **PITA'S VEHICLE**. At 4:55 p.m., **RAMOS**, via MX-9152, called **CELAYA**, via TT1 (Call No. 538). **CELAYA** told **RAMOS** that he was seven minutes away. **RAMOS** then gave additional direction on how to get to the 76 Gas Station. **RAMOS** and **CELAYA** then discussed how they would conduct the transaction with the third party who was bringing what is believed to be ten (10) pounds of methamphetamine to give to **CELAYA**.

45.    At 5:05 p.m., SA Kojayan observed **CELAYA** and Pita arrive in the lot of the 76 Gas Station, 3950 Pierce St, Riverside, CA in **PITA'S VEHICLE** and park between the 76 Gas Station and

Starbucks near a Nissan pick-up truck bearing CALP 05088M2 (hereinafter the Nissan Truck), registered to Jose Cardenas, 3630 24th Ave, Sacramento, CA. At 5:07 p.m., surveillance observed **CELAYA** talking to the driver of Nissan Truck, (who was later identified as **RAMOS**), which I believe to be the user of MX-9152. At approximately 5:12 p.m., **RAMOS** was observed talking on a cell phone and looking at the street. While **RAMOS** was on the phone, **CELAYA** opened the rear passenger door of **PITA'S VEHICLE** and sat on the floorboards of the van. A black Honda Civic bearing CALP 6HGH105 (hereinafter the Honda Civic), registered to ESPARZA, at 11229 Arizona, Riverside, CA (Esparza's Residence), flashed its headlights and pulled up behind **PITA'S VEHICLE** and the Nissan Truck. **CELAYA** exited **PITA'S VEHICLE**, opened the front passenger-side door of the Honda Civic, and entered the Honda Civic. SA Rodriguez observed **CELAYA** exit the Honda Civic carrying what appeared to be a white plastic grocery bag and placed the bag into the rear passenger compartment of **PITA'S VEHICLE** and close the van's sliding door. **RAMOS** then spoke to Esparaza while **RAMOS** was standing at the driver's door of the Honda Civic. The Honda Civic then departed. Less than a minute later, the Silver Minivan and Nissan Truck departed.

46. At approximately 5:17 p.m., Riverside Police Department Officers Prado and Duran conducted a traffic stop on the Nissan Truck for failing to signal when changing lanes. The driver, and sole occupant, of the Nissan Truck provided the officers with a CA Driver License A4320896 identifying himself as Jose Luis **RAMOS**. **RAMOS** told officers the address on the license, 8571 New Mountain Way, Sacramento CA, was a mailing address and he was currently living in Costa Mesa at his mother's house. **RAMOS** also provided telephone number: 949-205-8383. During the stop, the Officers observed multiple cell phones in the vehicle, one of which was receiving a call from a contact labeled as "Leevi."

/ / /

23

47.     At approximately 5:32 p.m., SA Rodriguez conducted a spot check of Esparza's Residence. A
        white Kia Sedan bearing CALP 7FCD737, registered to Israel MARTINEZ, 11229 Arizona,
        Riverside, CA [Esparza's Residence]; and a White Chevy Pick-up truck bearing CALP:
        8809Y94, which was not on file in the DMV database, were parked at the residence. At
        approximately 5:45 p.m., surveillance was terminated.

48.     At approximately 7:57 p.m., **CELAYA**, via TT1, received a phone call from 52-667-187-6108
        (hereinafter MX-6108) (Call No. 581). **CELAYA** told MX-6108 he would call back because he
        had the "jale," which is believed to be code for "methamphetamine." MX-6108 then told
        **CELAYA** that it, referencing the methamphetamine, would be more expensive. **CELAYA** said
        "okay" and the call ended.

49.     At approximately 12:57 p.m., Detectives from the Sacramento Area Interdiction and Narcotics
        Team (SAINT) conducted surveillance team and observed **PITA'S VEHICLE** travelling
        northbound on Highway 99 near Peltier Road. At approximately 1:20 a.m., **PITA'S VEHICLE**
        exited 47th Street East and traveled to **CELAYA'S RESIDENCE**. **CELAYA** then exited the
        driver's seat. Pita then exited the passenger seat, entered the driver's seat, and departed. As Pita
        departed in the vehicle, Detective Orozco observed **CELAYA** standing on the porch looking
        around. At approximately 1:27 a.m., Detective Andrew Miller observed Pita arrive at her
        residence and park the vehicle. When Pita exited the vehicle Detective Orozco observed Pita was
        empty-handed. At approximately 1:30 a.m., surveillance was discontinued.

50.     On December 3, 2020 at 1:39 a.m., **CELAYA**, via TTI, called **RAMOS**, via MX-9152 (Call No.
        605). The following is a transcript of the conversation:

| Sender | Message Sent | Translation from Spanish to English |
|--------|-------------|-------------------------------------|
| **RAMOS** | Bueno? | Hello? |
| **CELAYA** | Ya…Deje las muchachas con la morra | I…Left the girls with the girl |

| RAMOS | O, si? | Oh, yeah? |
|---|---|---|
| CELAYA | Simon, ya esta. Todo bien. | Yeah, it's set. Everything is good. |
| RAMOS | [I/I] | [U/I] |
| CELAYA | Yo mañana le marco. | I will call you tomorrow. |
| RAMOS | Entonces mañana entonces. | So then tomorrow, then. |
| CELAYA | Andale, pues. | All right, then. |
| RAMOS | Cuidese, [I/I]. | Take care, [U/I]. |

51.   Geolocation data of TT1 and x5386, between approximately 6:00 p.m. on December 2, 2020, and 1:30 a.m. on December 3, 2020, confirmed **CELAYA** traveled from the Southern California area to **CELAYA'S RESIDENCE** via Highway 99.

52.   Based on my training and experience, and knowledge of this investigation, I believe **CELAYA** hired Pita to drive him to Southern California in her vehicle to meet with **RAMOS** and Espinoza and pick up 10 pounds of methamphetamine. **CELAYA** then drove **PITA'S VEHCILE** back to Sacramento to his home.

53.   Between December 3, 2020 and December 7, 2020, **CELAYA** and Pita discussed **CELAYA** making payment to Pita for her services. The following is a transcript of the conversation:

| Sender | Message Sent | Translation |
|---|---|---|
| PITA<br>12/3/2020<br>2:27 p.m. | Vas ser depositado o cash? | Will it be deposited or cash? |
| **CELAYA**<br>12/3/2020<br>2:29 p.m. | *Called PITA* | |
| PITA<br>12/3/2020<br>5:06 p.m. | ? | ? |
| **CELAYA**<br>12/3/2020<br>5:06 p.m.. | Esperame porque paso algo ask yailiyn | Hold on cause something happened ask yailyn |
| PITA<br>12/5/2020<br>1:24 p.m. | So what happened | |
| PITA<br>12/5/2020<br>1:32 p.m. | When will drop the encargo today?? | When will drop the charge today?? |

| | | |
|---|---|---|
| **CELAYA**<br>12/5/2020<br>1:33 p.m. | Yea alrato aqui ando asiendo unas cosas y de pasada voy a pasar con el muchacho | Yea in a bit I am here doing some stuff and on my way back I will stop by with the guy |
| PITA<br>12/5/2020<br>1:33 p.m. | Okay | |
| PITA<br>12/5/2020<br>8:43 p.m | Cres que le puedas dar el encargo a yalien hoy y alrato yo paso por el porfas | You think you could leave the charge with yailen today and I will go by and get it please |
| PITA<br>12/5/2020<br>8:51 p.m. | Si iva ir pero sara quiere que valla a fumar un rato maybe les caigo en la casa de cocha alrato si pistean | Yeah I was going to go but Sara wants me to go smoke for a while maybe I will stop by at Cocha's house in a while if you are drinking |
| **CELAYA**<br>12/5/2020<br>8:51 p.m. | O ok | |
| PITA<br>12/5/2020<br>11:28 p.m. | Si tienes el pago ? | You have the payment? |
| **CELAYA**<br>12/5/2020<br>11:38 p.m. | Si aqui estoy con yailyn | Yes I am here with yailyn |
| PITA<br>12/6/2020<br>11:24 a.m. | Hey im home just incase you wanna drop it off | |
| **CELAYA**<br>12/6/2020<br>11:24 a.m. | Ok ill stop by | |
| PITA<br>12/6/2020<br>11:24 a.m. | Okay 🐌 forsure | |
| PITA<br>12/6/2020<br>12:54 p.m. | En cuanto pasas | When will you be here |
| **CELAYA**<br>12/6/2020<br>12:54 p.m. | 10 min | |
| PITA<br>12/6/2020<br>12:57 p.m. | ☺ | |
| PITA<br>12/7/2020<br>11:27 a.m. | Aquioras puedes pasar a dejar el resto ocupo pagar algo hoy | What time will you be by to drop off the rest I need to pay something today |
| **CELAYA**<br>12/7/2020<br>11:28 a.m. | Aqui vine a stockton dame como una hora en lo que regreso | I came here to Stockton give me an hour to get back |

| | | |
|---|---|---|
| PITA 12/7/2020 11:30 a.m. | Okay ta bien y esta semana no iremos a comer menudo nuevo ?? Haha | Okay that's fine and this week aren't we going to go eat new menudo?? Haha |
| **CELAYA** 12/7/2020 11:31 a.m. | Nose eso ando mirando | I don't know that is what I am looking at |
| PITA 12/7/2020 11:37 a.m. | Okay ay me avisas | Okay let me know |
| **CELAYA** 12/7/2020 11:39 a.m. | Ok | |
| PITA 12/7/2020 3:58 p.m. | Aquioras pasas ? | What time are you coming by? |
| **CELAYA** 12/7/2020 3:59 p.m. | Dise la cocha que no estes dando lata aca ando en el rancho | Cocha says stop bothering us we are here in the ranch |
| PITA 12/7/2020 4:00 p.m. | haha 😊 dile que me traiga de comer | Haha tell her to bring me food |
| PITA 12/7/2020 6:35 p.m. | Puedo pasar por el pago ocupo una linea de teléfono urgente haha 😊😊😊 | Can I come get the payment I need a telephone line urgently haha |

54.     Based on my training and experience, and knowledge of this investigation, I believe it took **CELAYA** several days to eventually pay Pita the whole amount he had promised to pay her, based on the frequency with which she asked when he would be stopping by to drop "it" off, and when he would have the "encargo," and when she could get the "pago" as she had a payment to make for her phone line.

      3.     **Probable cause to believe CELAYA resides at CELAYA'S Residence/Target Location 1**

56.     Agents conducted surveillance of **CELAYA** on December 3, 2020, and December 22, 2020. **CELAYA** was seen entering and departing from **CELAYA'S RESIDENCE/TARGET LOCATION 1**.  I, personally, have conducted approximately six spot check surveillances at different times of the day between April 2021 and August 2021, and have observed **CELAYA'S Red Chevrolet Silverado truck, CA license plate 61775S2**, registered to **CELAYA** at

27

CELAYA'S RESIDENCE/TARGET LOCATION 1 (hereinafter, **CELAYA'S VEHICLE**),

parked in the driveway of **CELAYA'S RESIDENCE/TARGET LOCATION 1**.  Furthermore,

for the duration of the TIII on TT1 and TA1, GPS location tracking was consistent with

**CELAYA** residing at **CELAYA'S RESIDENCE/TARGET LOCATION 1**.

57.    **TARGET LOCATION 1** is owned by Christopher Kanelos, at 8859 Mesa Brook Court, Elk

Grove, CA 95624 and was purchased in November 2010.

58.    Recently, on August 27, 2021, SA Thompson and United States Marshal Service Inspector

(USMS) Edgar Garcia conducted surveillance at **CELAYA'S RESIDENCE/TARGET**

**LOCATION 1** and USMS Garcia observed **CELAYA** arrive in **CELAYA'S VEHICLE**, park

it in the driveway. **CELAYA** exited the vehicle and entered the residence. .

### 4.    Probable cause to believe CELAYA uses CELAYA'S TELEPHONE and continues to distribute cocaine and methamphetamine

59.    On September 10, 2021, following CHS-1 conversation on Facebook Messenger, **CELAYA**

contacted CHS from telephone number **916-301-5403 (CELAYA'S TELEPHONE)**. The

following is a transcript of the conversation:

| Sender | Message | Translation from English to Spanish |
|---|---|---|
| **CELAYA** | Hey | Hey |
| **CHS** | Yo. Ya cambiastes de numbero otra vez | Yo. You changed your number again |
| **CELAYA** | Si ya cambie | Yes I changed it |
| **CHS** | Okay. Is this a business phone or personal (laughing emoji) | Okay. Is this a business phone or personal (laughing emoji) |
| **CELAYA** | Personal | Personal |
| **CHS** | Hey. So is this a good number to reach you for the sodas and the windows | Hey. So is this a good number to reach you for the sodas and the windows |
| **CELAYA** | Yea | Yea |
| **CHS** | Okay wasn't sure if you had a business phone | Okay wasn't sure if you had a business phone |
| **CELAYA** | Yea you can text me here | Yea you can text me here |

60.    Based on my training and experience, and knowledge of this investigation, I believe that in the above conversation **CELAYA** told CHS-1 he had changed his telephone number to to 916-301-5403 (hereinafter, **CELAYA'S TELEPHONE**). I believe that when CHS-1 asked **CELAYA** if that was the number CHS-1 could contact **CELAYA** about "sodas" and "windows" CHS-1 was referring to cocaine and methamphetamine, as those care common code words used for those types of drugs. I also believe **CELAYA** confirmed this is the number he uses to communicate with those to whom he distributes drugs when he told CHS-1 "Yea you can text me here."

61.    On September 10, 2021, a subpoena on T-Mobile for **CELAYA'S TELEPHONE** revealed the subscriber is Alberto Chavez, 4408 44th Avenue, Sacramento, CA.

**5.    CELAYA delivers half pound of methamphetamine to Martinez on December 20, 2020 (Probable cause to arrest CELAYA)**

62.    On December 20, 2020, **CELAYA** delivered a half pound of methamphetamine to MARTINEZ at his residence located at **973 Acacia Avenue, Sacramento, CA**.

63.    On December 3, 2020, at 2:01 p.m., the day after **CELAYA** returned from Riverside, CA, **CELAYA**, via TT1, called 916-804-6733 (hereinafter Target Telephone 8, or TT8) (Call No. 659). The user of TT8 was identified as Martinez. The following is a transcript of the conversation:

| Sender | Message Sent | Translation from Spanish to English |
|---|---|---|
| | [Al fondo: Ruido] | [Background: Noise] |
| MARTINEZ | Elo [PH]. | Hello. |
| CELAYA | Buenas tardes, Don Jesús. Este, soy el amigo de Alma. Este, ¿Qué le iba a decir…oiga, se acuerda que hace mucho me había preguntado por unas cosas? [Suspira] | Good afternoon Don Jesus. Hmm, I am Alma's friend. Hmm, what was I going to ask you…hey, do you remember that a long time ago you had asked me for some things? [Sighs] |
| MARTINEZ | Aja. | Aha. |
| CELAYA | Del, a, blancas. | The, hmm, white ones. |
| MARTINEZ | Si. | Yeah. |
| CELAYA | Este, de pura casualidad que | Hmm, just a coincidence that a |

| | | un camarada tiene.  Tiene unos. | buddy has some.  He has some. |
|---|---|---|---|
| | **MARTINEZ** | Um-hmm. | Um-hmm. |
| | **CELAYA** | No sé si a un le interesen o no. | I don't know if you are still interested or not. |
| | **MARTINEZ** | Ey, a, pues la cosa que mis chavalos ya agarraron. | Yeah, the, well the thing is my guy already got some. |
| | **CELAYA** | O, okey, okey, okey. | Oh, okay, okay, okay. |
| | **MARTINEZ** | Pues sí, ya te digo, sí. | Well yeah, I am telling you, yeah. |
| | **CELAYA** | Órale, bueno, pues ni modo. Sí, horita como llego dije yo, "deja ver si tiene una persona la quería". | All right, well, oh well.  Yeah, since it just got here, I said, "let me see if he has someone who wants some". |
| | **MARTINEZ** | Ey, si, horita va a llegar mi chavalo y le voy a preguntar a ver cómo anda horita.  Porque la agarrón, verán como una (1) semana o dos (2). | Yeah, yeah, right now my guy is getting here, and I will ask how he is doing right now.  Because they got it, see, like one (1) or two (2) weeks. |
| | **CELAYA** | Órale. | All right. |
| | **MARTINEZ** | Ey, a… | Yeah, a… |
| | **CELAYA** | Okey, si me avise— | Okay, yeah let me know— |
| | | [Interposición de voces] | [Voices overlap] |
| | **MARTINEZ** | ¿Este…si, si, ay del otro, horita? | Umm…yeah, yeah, is there some of the other one, right now? |
| | **CELAYA** | Si, si, bastante oiga.  Y ora si bueno, buenísimo. | Yeah, yeah, plenty.  And this time good, really good. |
| | **MARTINEZ** | A, a ver, da, dame el numero porque alguien me hablo horita.  Nomás que yo no, no dice de hacer nada.  Nomás me quería ver la numeración. | Let me see, give me the number because he called me right now.  Jus, he is not saying to do anything.  He just wanted to see my numbers. |
| | **CELAYA** | Este, de, se las dejo en unos veinte y cuatro (24). | Hmm, I will give them to you for twenty-four (24). |
| | **MARTINEZ** | Ya horita, a, yo te hablo patras [PH] en un ratillo. | Right now, already, for, I will call you back in a bit. |
| | **CELAYA** | Ándele pues, me dice. | All right then, let me know. |
| | **MARTINEZ** | Okey. | Okay. |
| | **CELAYA** | Sale. | All right. |
| | **MARTINEZ** | [I/I]. | [U/I]. |

64.     Based on my training, experience, and knowledge of the investigation, I believe **CELAYA** was

offering to sell Martinez "blancas," which translates to "whites" and is a code word frequently

used for cocaine. After telling **CELAYA** that his guy already had some, Martinez asked

CELAYA if he had the other stuff. **CELAYA** then offered to sell Martinez methamphetamine for $2,400 a pound.

65. Between December 3, 2020 and December 15, 2020, **CELAYA** and Martinez had multiple missed calls or calls where Martinez told **CELAYA** he would call **CELAYA** back.

66. On December 19, 2020 at approximately 3:08 p.m., **CELAYA**, via TT1, called Martinez, via 916-804-6733 (hereinafter Target Telephone 8, "TT8") (Call No. 1394). The following is a transcript of the conversation:

| Sender | Message Sent | Translation from English to Spanish |
|---|---|---|
| **MARTINEZ** | [Al fondo: voz] *Hello?* | [Background: voice] Hello? |
| **CELAYA** | Ey.  Dígame. | Yeah. What is it? |
| **MARTINEZ** | ¿Ah? No, no, yo nomás quería estar seguro si ibas a pasar 'orita. | Ah? No, no I just wanted to make sure if you were coming now. |
| **CELAYA** | Ah 'orita ando haciendo unos mandadillos. | I'm running some errands right now. |
| **MARTINEZ** | Ah … | Oh … |
| | [Interposición de voces] | [Voices overlap] |
| **CELAYA** | Ando acá … | I'm over here … |
| **MARTINEZ** | *… okay.* | |
| **CELAYA** | Este, ¿si me da una chancita? [Al fondo: música] | Um, can you give me a chance? [Background: music]. |
| **MARTINEZ** | *¡Oh, damn!* Porqué yo al rato voy a salir. | Oh, damn!  It's because I'm leaving in a little bit. |
| **CELAYA** | Oh, órale. | Oh, alright. |
| **MARTINEZ** | *Yeah.* | |
| **CELAYA** | Sí, acá ando, acá ando en el hospital. | Yes, I'm over here at the hospital. |
| **MARTINEZ** | *Oh, okay.* | |
| **CELAYA** | [I/I] Deje, ¿A qué horas va a salir usted? | [U/I] Let me, what time are you leaving? |
| **MARTINEZ** | Ah, por ahí cómo a las cuatro y media (4:30). | Oh, right around four-thirty (4:30). |
| **CELAYA**. | Ah, son las tres (3:00). Deme como una media (1/2) hora, 'orita, 'orita le marco a ver si un camarada ahí anda cerca de usted. | Oh, it is three (3:00).  Give me about half (1/2) an hour, I will, I will call you back and see if my buddy is around the area close to you. |

| MARTINEZ | *Ey. Okay*, y sino pos', um, ah, nomás me la arrimas mañana en la mañana, nomás me dices a qué horas, uh, pero que se haga mañana en la mañana. | bring it to me tomorrow morning, just let me know at what time, uh, but needs to be done tomorrow morning. |
|---|---|---|
| CELAYA | Ah, pos' sí, si es mañana en la mañana temprano, sí, porque es qué, traigo un dolor aquí en el, en el estómago y este [I/I] … | Oh, well then, if it's early tomorrow morning, yes, because, it's because I have a pain right here in the, the stomach and [U/I] … |
| | [Interposición de voces] | [Voices overlap] |
| MARTINEZ | *Okay.* | |
| CELAYA | Deje … | Let me … |
| MARTINEZ | A pos' 'ira, a, mañana en la mañana tempranito me hablas y, para hacerlo mañana tempranito, lo más temprano que se pueda. | Well, look, call me early tomorrow morning and, we can do it early tomorrow as early as possible. |
| CELAYA | *Okay*, está bien, este, ah, ¿igual, o ahora si uno (1)? | Okay, that's fine, um, oh, same, or a whole one (1) this time? |
| MARTINEZ | *Okay* … | |
| | [Interposición de voces] | [Voices overlap] |
| CELAYA | [I/I]. | [U/I]. |
| MARTINEZ | *Okay.* | |
| CELAYA | Le digo que si igual como la otra vez. | I'm saying if the same as the last time. |
| MARTINEZ | *Okay.* | |
| CELAYA | *Okay.* | |
| MARTINEZ | [I/I]. | [U/I]. |

67. On December 20, 2020 at approximately 1:21 p.m., Martinez, via TT8, sent **CELAYA**, via TT1, a text message (Call No. 1404): "No se ba aser" which translates to "Is it not going to happen?"

68. At approximately 1:50 p.m., **CELAYA**, via TT1, called Martinez, via TT8 (Call No. 1406). The following is a transcript of the conversation:

| Sender | Message Sent | Translation from English to Spanish |
|---|---|---|
| CELAYA | ¿Bueno? | Hello? |
| MARTINEZ | ¿Quiúbole? | What's up? |
| CELAYA | ¿Quiúbole? Este deje ver si aquel me da raite pa' allá | What's up? Um let me see if that guy will give me a ride over there right |

| | ahorita. | now. |
|---|---|---|
| MARTINEZ | *Okay*…pues… | Okay… well… |
| | [Interposición de voces] | [Voices overlap] |
| **CELAYA** | Pue… ¿usted no se puede acercar pa' acá o sí? | Wel…you can't come over, here can you? |
| MARTINEZ | No, en realidad no. | No, really, I can't. |
| **CELAYA** | *Okay*, deje busco un raite. Es como me acaban de sacar el *appendix* anoche. | Okay, let me find a ride. It's because they just took out my appendix last night. |
| MARTINEZ | ¡Oh! *Okay*, no, pero pues… | Oh! Okay, no, but well… |
| | [Interposición de voces] | [Voices overlap] |
| **CELAYA** | Deja... | Let me… |
| MARTINEZ | …si no, no si estas ah… si no se puede, pues no se puede y es todo, todo está bien. | … if not, if you are not uh… if it can't be done, well it can't be done and that's it, everything is okay. |
| **CELAYA** | No sí de todos, un camarada me anda ayudando. Deje le digo si me hecha raite pa' allá. | No yeah either way, there's a buddy that is helping me out. Let me ask him if he will give me aide over there. |
| MARTINEZ | Oh sí, pero no tengo suficiente pa' la entera. | Oh yeah, but I don't have enough for the whole one. |
| **CELAYA** | Oh, ¿nomas la mitad? *Okay*, no hay problema. | Oh, just half? Okay, not a problem. |
| | [Interposición de voces] | [Voices overlap] |
| MARTINEZ | Es la, es la cosa. | That's, that's the thing. |
| **CELAYA** | Ore… no hay problema. De todos modos, ahí quedo la otra | Alri… not a problem. Either way, the other half is here from what you |

| | mitad que, que se había llevado usted. | had taken. |
|---|---|---|
| MARTINEZ | Oh por eso sí fíjate, me arrepentí después de no haberte dicho porque el, él se la quería llevar, pero pues ya, ya habíamos quedado. | Oh, that's why yes, I was regretting it after for not telling you that he, he wanted to take it, but well, but we had already agreed. |
| **CELAYA** | Ajá. No si de todos modos ahí te veo. Ahorita se la llevo. Deje le digo al muchacho. | Uh-huh. Well yeah either way I'll see you there. I'll take it to you right now. Let me tell the guy. |
| MARTINEZ | *Okay*, dile y ya me avisas si es que sí va a venir si no. | Okay, tell him and then let me if he is coming or not. |
| **CELAYA** | *Okay*, esta bien. [I/I] *bye.* | Okay, that's fine. [U/I] bye. |

69.     At 1:52 p.m., **CELAYA**, via **TT1**, called Juan Carlos ESPINOSA MENDOZA, via 916-912-2563 (hereinafter Target Telephone 2, "TT2") (Call No. 1408). The following is a transcript of the conversation:

| Sender | Message Sent | Translation from English to Spanish |
|---|---|---|
| ESPINOSA | ¿Bueno? | Hello? |
| **CELAYA** | ¿'Onde anda señor? | Where are you mister? |
| ESPINOSA | Aquí estamos en la *yardisima* [PH], ¿qué hay que hacer? | We're here, at the yard, what do we have to do? |
| **CELAYA** | Nada, nada, nada.  ¿Qué te iba a decir?  ¿No tienes ahí tú una mitad (1/2)? | Nothing, nothing, nothing.  What was I going to tell you?  Do you have a half (1/2) there? |
| ESPINOSA | No, ya la picotie [PH]. | No, I already picked at it. |
| **CELAYA** | Oh, ¿sí? | ¿Oh, yeah? |
| ESPINOSA | Ya está picada | It's already picked at. |
| **CELAYA** | [Al fondo: timbre telefónico]. Órale. | [Background: telephone ring] Alright. |
| ESPINOSA | Pura *fayuca* "Celayense" [PH] | Only fails "Celayense". |
| **CELAYA** | O ¿Sí? Órale, órale, órale, 'ta bien, 'ta bien, güey.  A ver si ahorita por ahí me echo una | Oh, yeah? alright, alright, alright, that's good, that's good, dude.  I'll see if maybe I can swing by. |

| | vuelta. | |
|---|---|---|
| ESPINOSA | 'Ora pues, aquí voy a andar … | Right on, I'll be around here… |
| | [Interposición de voces] | [Voices overlap] |
| **CELAYA** | [I/I]. [Al fondo: timbre telefónico]. | [U/I]. [Background: telephone ring] |
| ESPINOSA | *… ten-four (10-4) alright.* | |

70.     On December 20, 2020, at approximately 1:58 p.m., Anguiano, the user of the Facebook account

EL PELON ONAIUGNA, 100028614664098 (ANGUIANO spelled backwards), contacted

**CELAYA** to tell him he had heard about **CELAYA**'S surgery. **CELAYA** explained he had his

appendix removed and was in a lot of pain. Anguiano told **CELAYA** he could help him with

picking up medication for him or anything else **CELAYA** should need. **CELAYA** and Anguiano

then exchanged a series of messages. Below is a transcript of those messages:

| Sender | Message Sent | Translation from Spanish to English |
|---|---|---|
| **CELAYA** | Que vas hacer en un rato | What are you going to do in a little while |
| ANGUIANO | Pos tengo ke aser Christmas shopping. Porke wey | Well I have to do some Christmas shopping. Why dude |
| **CELAYA** | Ocupaba ir por una feria | I need to go get some money |
| ANGUIANO | A donde? | Where? |
| **CELAYA** | Aya por la Marconi | Over there by Marconi |
| ANGUIANO | Gente de confiansa? | Trustworthy people? |
| **CELAYA** | Simon | Yeah |
| ANGUIANO | I can go for u just let them know bro | |
| **CELAYA** | Ok deja ver si ya esta en su casa | Ok let me know if they are already in there house. |
| ANGUIANO | Ok | OK |
| ANGUIANO | *El Pelon sent a voice message* | |
| ANGUIANO | *You missed a call from Pelon* | |
| **CELAYA** | Simon | Yeah |
| ANGUIANO | *Thumbsup emogi* | |
| ANGUIANO | We outside | We outside |
| ANGUIANO | *You missed a call from El Pelon* | |

| CELAYA | Ok | Ok |
|--------|-----|-----|

71. In these messages, based on my training and experience and knowledge of this investigation, I believe **CELAYA** was asking Anguiano to drive him to make a delivery of drugs to Martinez with whom **CELAYA** had telephone calls with where they discuss **CELAYA** delivering a "half" which I believe to be a half pound of methamphetamine.

72. Following the conversations between **CELAYA**, Martinez, and Anguiano, **CELAYA** (driven by Anguiano in Anguiano's VEHICLE), traveled to 7041 Luther Drive, Sacramento, CA, where agents believe **CELAYA** picked up a half pound of methamphetamine. **CELAYA** then traveled to Martinez's residence.

73. At approximately 5:02 p.m., **CELAYA**, via **TT1**, called Martinez, via TT8 (Call No. 1425). The following is a transcript of the conversation:

| Sender | Message Sent | Translation from English to Spanish |
|--------|--------------|-------------------------------------|
| **MARTINEZ** | [Al fondo: música] ¿Quiúbole? | [Background: music] What's up? |
| **CELAYA** | Aquí estoy oiga. | I'm here sir. |
| **MARTINEZ** | *Okay,* sí. | Okay, yeah. |
| **CELAYA** | Sale. | Alright. |

74. At approximately 5:02 p.m., Det. Hertoghe observed a Silver Ford F-150 pickup truck, bearing CALP: 75657T2, registered to Raul Anguiano arrived at Martinez's residence. The passenger door opened; CELAYA exited the passenger seat wearing a hoodie style sweatshirt with a front pocket. CELAYA approached the residence and was out of view of surveillance team. Two minutes later, CELAYA returned to Anguiano's vehicle, entered the passenger seat, and the pickup truck departed the residence.

75. Based on my training, experience, knowledge of this investigation, I believe **CELAYA** sold Martinez a half pound of methamphetamine at Martinez's residence.

/ / /

**6.      CHS-1 conducts a controlled two-pound methamphetamine buy from CELAYA and MENDOZA on December 22, 2020 (Probable cause to arrest CELAYA and to search CELAYA'S RESIDENCE/TARGET LOCATION 1)**

76.      On December 22, 2020, CHS-1 conducted a controlled two-pound methamphetamine buy from **CELAYA** and **MENDOZA**. The buy had originally been scheduled for December 17, 2020, however **CELAYA** was admitted to the hospital for emergency surgery that same morning.

77.      On December 15, 2020, at approximately 11:39 a.m., CHS-1 contacted **CELAYA** at telephone number 916-320-5386. **CELAYA** told CHS-1 he was not working at the moment, and asked if CHS-1 "had work" for him. CHS-1 told **CELAYA** it was possible that he/she did. **CELAYA** then said he would call CHS-1 back from a different telephone number. CHS-1 then received a telephone call from **CELAYA** from 725-207-4311 (TT1) where **CELAYA** agreed to meet with CHS on December 17, 2020, to sell CHS-1 two pounds (of methamphetamine) to CHS at $2,500 each.

78.      On December 17, 2020, while surveillance was attempting to locate **CELAYA** prior to the operation using geolocation precision systems data on TT1, they found **CELAYA'S VEHICLE** parked at Methodist Hospital of Sacramento, 7500 Hospital Drive, Sacramento. Between 10:45 a.m. and 11:00 a.m., CHS-1 placed several calls and texts to **CELAYA** that went unanswered. At 11:04 a.m., CHS-1 and **CELAYA** exchanged text messages to coordinate the buy as follows:

| Sender | Message | Translation from English to Spanish |
|--------|---------|-------------------------------------|
| **CELAYA** | Que I'm waiting on my results I should be out in a min | That I'm waiting on my results I should be out in a min |
| **CHS** | Results for what. What's the plan you good? | |
| **CELAYA** | O came ti the ER had a big pain in my stomach and para que lando andas tu | O came to the ER had a big pain in my stomach and what area are you in |
| **CHS** | I can meet you where you met | I can meet you where you |

|  | primo | met cousin |
|---|---|---|
| **CELAYA** | Ok sounds good | |
| **CHS** | 30 min good? | |
| **CELAYA** | Yes it should be | |
| **CHS** | Okay si no puedes me avisas no me vayas a dejar esperando | Okay if you can't let me know do leave me waiting |
| **CELAYA** | Yeah I got all the food ready | |
| **CHS** | Okay | |
| **CELAYA** | Todavia estoy aqui no se apuran | |
| **CHS** | Okay | |
| **CELAYA** | Deja ver si mi compa anda serca y que el te las de | Let me see if my buddy is close and I will have him give them to you |
| **CHS** | Okay<br><br>Hey se va hacer<br><br>Or I gotta go<br><br>Tengo cosas que hacer | Okay<br><br>Hey is this going to happen<br><br>Or I gotta go<br><br>I have things to do |
| **CELAYA** | Si se va hacer | Yeah it will happen |

79.   During and after the surveillance, **CELAYA** had conversations on TA1 with several Facebook Messenger users, and later, on TT1 with **RAMOS**. **RAMOS** indicated that he was in the hospital with several possible health issues. The surveillance was terminated.

80.   On December 18, 2020, CHS-1 placed a call to **CELAYA** at telephone number 916-320-5386. **CELAYA** told CHS-1 he would be available to meet with CHS-1 on December 20, 2020, but he would confirm later. **CELAYA** claimed he had "it" (methamphetamine) in his truck while he was in the hospital. **CELAYA** then said he would "work on the price" for CHS-1. Based on my training and experience, I believe **CELAYA** was telling CHS-1 he was going to reduce the price on the methamphetamine because of the delay in the transaction.

/ / /

81.     On December 20, 2020, at approximately 10:27 a.m., **CELAYA** sent a text message via TA1 to

**MENDOZA** on his Facebook account "Luis M. **MENDOZA**" which read: Donde andas

(translation: "where are you").

82.     Surveillance was established in the vicinity of  **CELAYA'S RESIDENCE/TARGET**

**LOCATION 1** at approximately 10:30 a.m. **CELAYA** then sent a message over TA1 to CHS-

1's Facebook account which read: Ya levantate (Get up). **CELAYA** then attempted to contact

CHS-1 via a call on TA1 which CHS-1 did not answer. At approximately 10:46 a.m., CHS

placed a consensually monitored and recorded telephone call to **CELAYA** at telephone number



916-320-5386. **CELAYA** answered the call and said he was ready to meet with CHS. **CELAYA**

attempted to change the meet location to the 99 cents store on Franklin Boulevard and Florin

Road, but said anywhere would be fine. They agreed to meet at 11:30 a.m. in the parking lot of

the Florin Mall.

83.     At approximately 10:46 a.m., SAINT Detective Arambula conducted surveillance at

**MENDOZA'S** address at **5743 Nina Way Sacramento, CA,** where he observed a red Ford

Expedition, with CA license plate 8HUH552 registered to Beatriz Arriola, 7589 Tamoshanter

Way, Sacramento, CA, and a white Toyota Prius parked in the driveway.  At approximately

10:58 a.m., **CELAYA** received a message from **MENDOZA** via TA1 which read: "My house

whats up." On September 13, 2021, I checked the current registration to the red Ford Expedition

and the registered owner is **MENDOZA** at his residence, valid from June 14, 2020 to June 14,

2021.

84.     At approximately 10:05 a.m., **CELAYA** calls began coming in on TT1 from 52-3311739960 and

**RAMOS** which went unanswered. SAINT Detective Cabrera observed a small green pick-up

truck, later identified as **RAMOS'** truck, bearing CA license plate 05088M2, arrive at

**CELAYA'S RESIDENCE/TARGET LOCATION 1**. **CELAYA** received an incoming call on

TT1 from 52-3311739960 which **CELAYA** answered and the caller was **RAMOS**.  **RAMOS**

told **CELAYA** he was outside of **CELAYA**'s house and **CELAYA** stated he was not home and

would return in 30 minutes. Det. Cabrera observed **RAMOS** leave in the truck.

85.     At approximately 11:12 a.m., **CELAYA** and **MENDOZA** exchanged several messages which

read as follows:

| NAME | TRANSCRIPT | TRANSLATION |
|------|-----------|-------------|
| **CELAYA** | Vas hacer algo ahorita | You going to do something right now |
| **MENDOZA** | No k paso | No what's up |
| **MENDOZA** | Tengo que ir hacer algo a las 230 pm pero ahorita nada | I have to go do something at 230 pm but nothing right now |
| **CELAYA** | Me das un raite aqui a la Florin y Franklin | Will you give me a ride right here on Florin and Franklin |
| **MENDOZA** | Simon donde estas | Yeah where are you |
| **CELAYA** | Aqui con mi jefa | Here with my mom |
| **MENDOZA** | Ok paso por ti en. 20 min | Ok I will pick you up in 20 minutes |
| **CELAYA** | OK | OK |
| **MENDOZA** | Esta bien si paso por ti a las 12 pm. Mejor Sin falta guey esoty esperando que venga un vato por la Mota. Dice que llega en 10 a 20 min. | Is it ok if I pick you up at 12 pm. It's better dude I am waiting for a guy to pick up the weed. He said he will be here in 10 to 20 minutes. |
| **CELAYA** | Ok deja le digo al morro que se espere | Ok let me tell the guy to wait |

86.   Based on my training and experience and knowledge of this investigation, I believe **CELAYA** was asking **MENDOZA** to go with him to pick up drugs from his stash house to deliver to CHS-1.  **MENDOZA** asked **CELAYA** for more time as he was waiting for his marijuana customer to arrive to buy from **MENDOZA**.

87.   SA Cuthbert and Det. Orozco searched CHS-1 and their vehicle, provided $5,000 to purchase the methamphetamine from **CELAYA** and **MENDOZA** and provided the audio and video recording devices. At approximately 11:51 a.m., **CELAYA** and **MENDOZA** engaged in four audio calls via TA1 which were not captured on the TIII. At 11:52 a.m. Det. Arambula checked **MENDOZA**'S address and the red Ford Expedition was no longer at the residence.

88.   At 11:54 a.m., CHS departed the staging location followed by SA Cuthbert and Det. Orozco on a pre-determined route to Florin Mall. Det. Cabrera observed a person resembling **CELAYA** standing outside **CELAYA'S RESIDENCE/TARGET LOCATION 1**. CHS-1 received a telephone call from **CELAYA** confirming their meet at Florin Mall. At approximately 11:59 a.m., Det. Cabrera observed a red Ford Expedition pull up to **CELAYA'S RESIDENCE/TARGET LOCATION 1** and the person (presumably **CELAYA**) waiting outside the residence entered the passenger side of the red Expedition.

89.   At 12:05 p.m., SAINT Det. Drury observed the red Expedition arrive at 7041 Luther Drive, Sacramento, and park in the driveway outside a gate. A white truck approached the gate and the driver exited and opened the gate to allow the red Expedition to enter. The red Expedition entered the lot and drive to the north end of the lot. **CELAYA** received a telephone call on TT1 from telephone number 916-912-2563, believed to be used by Juan Carlos ESPINOSA MENDOZA (ESPINOSA). ESPINOSA told **CELAYA** he was by Franklin (Boulevard) and 47th (Avenue) and asked what needed to be done. **CELAYA** said he thought ESPINOSA was at the yard. ESPINOSA said he would be at the yard in two minutes.

41

At 12:11 p.m., Det. Drury observed the passenger and driver (**CELAYA** and **MENDOZA**) exit the vehicle, walk under an over-hang, and then return to the vehicle. **CELAYA** exited the vehicle again, reached into a sport utility vehicle and then returned to the passenger side of the



Ford Expedition. Det. Drury observed the Ford Expedition driving through the lot at 7041 Luther Drive to the gate and depart. At approximately 12:21 p.m., CHS-1 received a telephone call from **CELAYA** who said he was at the light and was arriving in a red car. Det. Milton observed the red Ford Expedition arrive at the Florin Mall and park next to CHS-1. The driver of the vehicle was observed wearing a red hat. CHS-1 received a telephone call from **CELAYA** which was consensually monitored and recorded. **CELAYA** asked CHS-1 to get in the car with them as he was not able to walk. CHS-1 entered the rear passenger door of the Expedition where CHS-1 observed **MENDOZA** in the driver seat and **CELAYA** in the front passenger seat. CHS-1 observed a box sitting on the center console containing the bags of suspected methamphetamine. CHS-1 asked **CELAYA** how much it would be and **CELAYA** responded that it would be "24 for the wait" indicating the discount. CHS-1 counted out the money for **CELAYA** and handed it to him. **CELAYA** placed the money in his lap without counting. CHS-1 exited the Expedition and **CELAYA** and **MENDOZA** departed. **CELAYA** received a call on TT1 from 52-

3311739960, where RAMOS was the caller. RAMOS told **CELAYA** he was at **CELAYA**'S

mother's house and **CELAYA** said he would be arriving in approximately 10 minutes.

90.     CHS returned to the staging location under FBI surveillance where the suspected

methamphetamine in an Amazon Prime box, recording devices and remaining cash were

recovered. CHS-1 vehicle and CHS were both searched and were negative for contraband. The

Amazon Prime box containing the methamphetamine had an address label with the name and

address of: **Luis MENDOZA**, **5743 Nina Way, Sacramento, CA 95824** [MENDOZA'S

RESIDENCE**]**.

91.     At approximately 12:39 p.m., surveillance observed **RAMOS** return in the green Nissan pick-up

to **CELAYA'S RESIDENCE/TARGET LOCATION 1**. **CELAYA** and **RAMOS** were

observed talking next to the Nissan pick-up truck. At approximately 1:50 p.m., **RAMOS**

departed in the Nissan. Surveillance was discontinued.

92.     CHS-1 was shown a DMV photograph of **MENDOZA** who positively identified the driver of the

red Ford Expedition. Below is a still photograph from the audio video recording from the above-

described operation.



93.     Investigators conducted a "nartec" field test of the suspected methamphetamine which produced

a positive result for the presence of methamphetamine. The drug items were sent to the DEA lab

to be analyzed.

94.     On August 27, 2021, Sacramento Metropolitan Utilities District responded to a request for information for the residence at MENDOZA'S RESIDENCE, and advised the current customer paying utilities at that address was **MENDOZA**, with a start service date of February 6, 2017, using telephone number 916-807-9824.

95.     On September 9, 2021, California Employment Development Department (EDD) responded to a request for employment verifications for **MENDOZA**. The EDD return indicated **MENDOZA** provided his residential address as MENDOZA'S RESIDENCE, and telephone number 916-807-9824 as of January 11, 2021.

96.     On September 9, 2021, at approximately 6:00 a.m., DEA SA Joshua Matas and USMS Entonio Gunn observed **MENDOZA** leaving MENDOZA'S RESIDENCE and accessing a dark colored sport utility vehicle.

97.     A request for toll records for telephone number 916-807-9824 between the dates of July 25, 2021 and September 10, 2021, revealed **MENDOZA** is in communication with Erik ESPINOZA, the user of 916-283-1034. ESPINOZA was in frequent communication with **CELAYA** on TA1 where they discussed the sale of methamphetamine to ESPINOZA and **CELAYA'S** concern about a seizure of methamphetamine. Open source records[5] show ESPINOZA is still using the same telephone number as of September 11, 2021.

98.     The listed owner for MENDOZA's residence is Jenny Chen, 260 Loyola Drive, Millbrae, CA 94030, with a purchase date of March 2018.

6.      **Additional Probable Cause to Support the Search of the Target Locations Evidence of Narcotics Trafficking Crimes is Likely to be Found at the Target Locations.**

99.     Based on my training and experience, and knowledge of this investigation, I believe the following:

_____

[5] Specifically, the CLEAR database.

44

a.  Narcotics trafficking is an ongoing or continuing criminal enterprise. Narcotic traffickers, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions. Drug traffickers tend to keep these accounts and records in their residence, vehicles, safes, storage containers, and in other areas under their control.

b.  Because narcotic traffickers frequently continue their criminal activity indefinitely, they keep records of their illegal activities for a period of time extending beyond the time during which they actually possess controlled substances, in order to maintain contact with criminal associates for future narcotics transactions, and to have records of prior transactions for which, for example, they might still be owed narcotic proceeds, or might owe someone else money. Because possession of the documents themselves, unlike possession of narcotics, is not illegal, narcotic traffickers often fail to take precautions to destroy or conceal the documentation. Therefore, documentation may survive for many months, sometimes years, after a large volume drug transaction has occurred, often in the traffickers' residences and vehicles. Such documentation may be in hard copy form or stored in digital devices such as computers, cell telephones and other mobile communication devices.

c.  Individuals involved in narcotics trafficking commonly provide narcotics to trusted distributors in their organization on credit, and commonly obtain narcotics from their suppliers on credit. Therefore, I am aware that individuals involved in narcotics trafficking maintain books, records, customer lists, receipts, notes, ledgers and other papers relating to the transportation, receipt, ordering, sales, and distribution of narcotics, narcotics proceeds, and equipment, and that such documents may be in code to thwart law enforcement detection. Such records often indicate the identity of co-conspirators. The aforementioned books, records, receipts, notes, ledgers, correspondence, etc., are commonly maintained where the narcotics traffickers have ready access to them, i.e., homes, offices, and automobiles. Such documentation may be in hard copy form or stored in digital devices such as computers, cell telephones and other mobile communication devices.

d.  Drug traffickers often place their assets in names other than their own to avoid detection of those assets by law enforcement; those persons are commonly family members, spouses or companions, friends, and associates who accept title of assets to help the trafficker avoid discovery and detection.

e.  Individuals involved in narcotics trafficking will conduct narcotics-related activities at various locations and residences in an effort to avoid law enforcement detection.

f.  Individuals involved in narcotics trafficking often conceal evidence of their drug trafficking, including narcotics and narcotics proceeds, in their residences, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses.

g.  Narcotics traffickers often utilize vehicles to transport and distribute controlled

substances in facilitation of their trafficking activities. Traffickers will also utilize vehicles as locations to store controlled substances prior to distribution. Large-scale traffickers will often use vehicles with hidden compartments, also known as traps, to store narcotics or narcotics proceeds in order to conceal the presence of such contraband from law enforcement. Narcotics traffickers will often utilize vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

h.   Individuals involved in narcotics trafficking commonly use certain paraphernalia to package and prepare controlled substances for distribution (such as tupperware, cellophane, heat sealers, gylcine or plastic baggies, latex gloves, cutting agents and dilutents, chemical testing devices, triple beam scales and other weighing devices, measuring devices, strainers, compression devices, etc.). Individuals involved in narcotics trafficking commonly store these items in their residences, garages, outbuildings, storage areas, carports, and in the residences of friends or relatives, in their vehicles, and in other areas to which the traffickers have ready access.

i.   Individuals involved in narcotics trafficking generally sell narcotics for cash proceeds. Narcotics traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business. Narcotics traffickers often keep large sums of currency, caches of narcotics, financial instruments, precious metals, jewelry, automobiles, and other items of value and/or proceeds of narcotic transactions, including evidence of financial transactions related to obtaining, transferring, secreting, or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence, vehicles, safes, storage containers, and in other areas under their control. Unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

j.   Individuals involved in narcotics trafficking often launder money obtained through illegal drug transactions through legitimate businesses. Traffickers who are involved in such money laundering often structure financial transactions to avoid reporting requirements, and often keep records of their activities and financial transactions. To escape detection, however, they mix and intermingle those records with records of lawful transactions. In such instances, it is necessary to analyze the entire record to isolate the records of unlawful transactions, and it is not feasible to extract the records of unlawful activities without such analysis.

k.   Additionally, when narcotics traffickers amass large quantities of cash from the sale of narcotics, they will sometimes attempt to legitimize these profits through the use of banks and financial institutions and their services, including accounts, securities, traveler's checks, cashiers' checks, money orders, wire transfers, certificates of deposit, and safe deposit boxes. Records from such transactions are often maintained in residences, offices, garages, storage buildings, automobiles, and safe deposit boxes.

l.   Narcotics traffickers typically will obtain and distribute controlled substances on a regular basis, as a distributor of a legitimate commodity would purchase stock for sale

/ / /

46

m.    such narcotics traffickers will also have an "inventory" which will fluctuate in size depending on the demand for the product.

n.    Narcotics traffickers commonly have in their possession (that is, on their person, at their residence, and in areas under their control), firearms, including, but not limited to, handguns, pistols, revolvers, rifles, shotguns, machine guns, silencers, and other weapons. Such firearms are used to protect and secure a trafficker's property. Such property may include, but is not limited to, narcotics and other dangerous drugs, jewelry, narcotics paraphernalia, books, records, ledgers, and quantities of currency related to their drug trafficking activity. o. Narcotics traffickers may take or cause to be taken, photographs, videotapes, or other recordings of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residences or in the areas under their control.

o.    Narcotics traffickers may maintain in their possession or at their residence fictitious identification, including, but not limited to, drivers licenses, employment cards, insurance cards, social security cards, naturalization records, certificates of birth and passports which are obtained by the traffickers and utilized in an effort to prevent law enforcement identification of the traffickers and their narcotic trafficking activity.

p.    Individuals involved in narcotics trafficking often use cellular telephones and other communication devices sometimes in fictitious and/or other individual's names. Traffickers commonly receive telephone calls, voicemail messages and text messages from individuals seeking to conduct narcotics transactions. As a result, traffickers often maintain in their residences, vehicles, and locations where they conduct transactions, records and items that reflect or contain names, addresses, and/or telephone numbers for their associates and co-conspirators in the DTO. These records and items include telephone address books and telephone listings, text messages, voicemails, as well as letters, telephone bills, e-mails, and personal notes reflecting names, identities, addresses, and telephone numbers. Traffickers often keep records and evidence of their illegal activities for a period of time extending beyond during which they actually possessed illegal narcotics and controlled substances, in order to maintain contact with their criminal associates for future narcotic transactions, and so that they can have records of prior transactions for which a trafficker might still be owed money, or might owe someone else money.

q.    Individuals involved in narcotics trafficking often use various locations to serve different functions so that customers, thieves, and law enforcement do not learn about any one location where large quantities of narcotics, money, and/or other narcotic-related assets are stored. Therefore, one or more locations are often used to store lesser amounts of narcotics, money, and/or narcotics-related assets, and additional locations are used to meet customers.

r.    It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators with whom I have spoken, that the items listed in the **Attachment B**, as they relate to narcotics trafficking offenses, which are incorporated into this affidavit by reference, are items often associated with the trafficking and

distribution of controlled substances, including, but not limited to, methamphetamine, crack cocaine, marijuana, and prescription pills, as well as the proceeds from such illegal operations.

## V.        SEARCH OF DIGITAL INFORMATION

100.   Your affiant is aware that drug and firearms traffickers, including **CELAYA** and **RAMOS**, and

**MENDOZA** use computers, smart phones, and other electronic media to conduct their trade. As

described above and in **Attachment B**, your affiant submits that computers, smart phones, and

possibly other storage media will be found within the Target Locations and on the persons of

**CELAYA**, **RAMOS**, and **MENDOZA** and there is probable cause to seize those items for the

reasons stated below.  Some of these electronic records might take the form of files, documents,

and other data that is user-generated.  Some of these electronic records, as explained below,

might take a form that becomes meaningful only upon forensic analysis.

101.   For example, based on my knowledge, training, and experience, your affiant is aware that a

powered-on computer maintains volatile data.  Volatile data can be defined as active information

temporarily reflecting a computer's current state including registers, caches, physical and virtual

memory, network connections, network shares, running processes, disks (floppy, tape and/or

CD-ROM), and printing activity. Collected volatile data may contain such information as opened

files, connections to other computers, passwords used for encryption, the presence of anti-

forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed.

Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and

unplugged.

102.   Based on my knowledge, training, and experience, your affiant knows that computer files or

remnants of such files can be recovered months or even years after they have been downloaded

onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a

storage medium can be stored for years at little to no cost.  Even when files have been deleted,

they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

103.    Also, again based on your affiant's training and experience, wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.  Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

/ / /

104.    As further described in **Attachment B**, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

105.    As further described in **Attachment B**, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

106.    Thus, the forensic analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

107.    In cases of this sort, laptop computers and/or smartphones are also used as instrumentalities of the crime to commit offenses involving interstate drug sales and movement of drug proceeds. Devices such as modems and routers can contain information about dates, frequency, and computer(s) used to access the Internet.  The laptop or smart phone may also have fingerprints on them indicating the user of the computer and its components.

108.    Similarly, files related to the purchasing and selling of controlled substances, as well as, the movement of currency found on computers and other digital communications devices are usually obtained from the Internet or the cellular data networks using application software which often

leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the data, search terms used, exchange, transfer, distribution, possession or origin of the files.  Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary internet directory or "cache".  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed internet pages or if a user takes steps to delete them.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

109.   "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. Your affiant knows from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of internet connection at the residence.

110.  Searching the computer(s) for the evidence described in the attachment may require a range of data analysis techniques.  For example, information regarding user attribution or internet use is located in various operating system log files that are not easily located or reviewed.  In addition, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names.  As explained above, because the warrant calls for records

of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents.  Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this location (the computer) for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant.  Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space.  This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

111.   Based upon knowledge, training and experience, your affiant knows that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

112.   The nature of evidence:  As noted above, not all evidence takes the form of documents and files that can be easily viewed on-site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as

/ / /

a "booby-trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

113.   The volume of evidence and time required for an examination:  Storage media can store the equivalent of millions of pages of information.  Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

114.   Technical requirements:  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off- site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

115.   Variety of forms of electronic media:  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

/ / /

116.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant.  The examination may require techniques, including but not limited to, computer-assisted scans of the entire medium that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## VI.    CONCLUSION

117.    Based on the foregoing, I believe there is probable cause that the above-identified Target Subjects committed the offenses summarized above.  Also, based on the foregoing, I submit there is probable cause to believe that evidence, fruits, and instrumentalities of the various federal offenses summarized above, as those items are set forth in **ATTACHMENT B**, will be located at the **TARGET LOCATIONS** (as those are described in **ATTACHMENTS A-1** through **A-3**).

118.    Other than CELAYA, and CELAYA'S parents, I am not aware of any other individuals residing at CELAYA'S RESIDENCE/TARGET LOCATION 1.  Accordingly, I am requesting authority that the search shall include all rooms, garages, storage rooms or outbuildings of any kind, attached or unattached, located on the premises, as well as the surrounding grounds and curtilage, and any containers located on any of the premises associated with CELAYA'S RESIDENCE/TARGET LOCATION 1, unless agents determine the room, garage, outbuilding, or containers are the exclusive property of CELAYA'S parents, or someone other than CELAYA.

/ / /

/ / /

## VII.        REQUEST FOR SEALING

119.  It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation.  I have learned that criminals actively search for criminal affidavits and search warrants via the Internet and disseminate them to other criminals as they deem appropriate, i.e., post them publicly online.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.  If the targets learned of the nature and scope of the investigation even after the execution of the search warrant, they may flee and warn co-conspirators, and/or change their methods and modes of operation to avoid further detection.

/s/ Laura Cuthbert
_____
LAURA CUTHBERT
FBI Special Agent

Sworn and Subscribed to me telephonically on September ___20___, 2021

_____
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

Approved as to form:

_____
VINCENZA RABENN
Assistant United States Attorney

# ATTACHMENT A-1

### *4104 40ᵗʰ Avenue, Sacramento, CA*





4104 40th Avenue, Sacramento, CA is a single family dwelling with 3 bedrooms, 1 bathroom, and an attached garage. The house is located on the south side of the 40th Avenue, facing north, with black house numbers "4104" located on the brick exterior in front of the driveway. The house has a red brick exterior with cream colored porch and a white metal security door.

ANY and ALL rooms, attics, basements, and other parts herein, the surrounding grounds, and any garage, storage rooms, vehicles, trailers, barns, outbuildings of any kind, attached or unattached, located thereon.  (See attached photograph accurately depicting the property).

ANY and ALL vehicles parked on or in front of the subject premises at the time of the service of the search warrant, under control of Jesus **CELAYA** based on registration information and/or possession of keys.

# ATTACHMENT A-2

### *Location to be Searched*

**A cellular telephone bearing Mobile Directory Number 916-301-5403**, (Target Telephone) subscribed to Alberto Chavez, 4408 44th Avenue, Sacramento, CA 95823, and used by CELAYA.

## ATTACHMENT A-3

### *Location to be Searched*

**A Red Chevrolet Silverado truck, CA license plate 61775S2**, registered to Jesus CELAYA at 4104 40th Avenue, Sacramento, CA**.**

# ATTACHMENT B

<u>ITEMS TO BE SEIZED:</u>

1. The items to be seized are evidence, fruits, and instrumentalities of conspiracy to distribute controlled substances, distribution of controlled substances, and possession with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846, 841(a)(1):

a. Any controlled substance, including but not limited to: methamphetamine, marijuana, or tetrahydrocannabinol ("THC") in any form;

b. Paraphernalia commonly associated with the manufacture and packaging for sale or the transportation of controlled substances, including cutting agents and diluents, chemical testing devices, packaging materials such as glycine or plastic bags, tupperware, cellophane, heat sealers, triple beam scales and other weighing devices, measuring devices, strainers, boxes, and scientific grade beakers;

c. Cash over $5,000;

d. Still photographs, graphic images, slides, video clips, visual mediums, and any record, file, or data of their origins, that are evidence of the violations set forth in paragraph 1 above;

e. Telephones, including cellular telephones, pagers, beepers, answering machines, and other communication devices, and communication device documentation (e.g., customer service records, billing statements, credit information, toll records, etc.) that are in the possession of or under the control of Jesus CELAYA, Jose Luis RAMOS, or Luis MENDOZA.

f. Items used in the packaging of currency for consolidation and transportation, such as money counting machines, money wrappers, rubber bands, duct or wrapping tape, and plastic sealing machines;

g. Bank account records, wire transfer records, bank statements, safe deposit box keys and records, money containers, financial records and notes, which were created, modified, or stored in any form, including on any digital device, and which show payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances;

h. Drug or money ledgers, drug distribution or customer lists, correspondence, notations, logs, receipts, journals, books, records and other documents, which were created, modified, or stored in any form, including on any digital device, and which indicate the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed;

i. Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, documents and other items, which were created, modified, or stored in any form, including on any digital device, and which reflect contact information, names, addresses, telephone numbers, or any other personal information of participants in narcotics trafficking activities, including suppliers, distributors and customers;

j.  Communications, including voicemails, incoming, outgoing and draft text messages, picture messages, video messages, and incoming and outgoing emails, related to the violations set forth in paragraph 1 above, which were created, modified, or stored in any form, including in digital form on any digital device;

k.  Documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals and stones, jewelry or other items obtained with the proceeds of drug trafficking activities;

l.  Records of off-site storage locations, including safe deposit box keys, records, receipts and rental agreements for storage facilities;

m.  Records, items and documents reflecting travel for the purpose of participating in drug trafficking or money laundering activities, including passports, airline tickets, vehicle rental receipts, DMV registration and ownership records, credit card receipts, hotel and restaurant receipts, cancelled checks, maps and records of long distance calls reflecting domestic and foreign travel;

n.  Firearms including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition silencers, components of firearms including components or tools which can be used to modify firearms, ammunition and ammunition components including gunpowder, primers, bullets, shells, wads, shot, and the tools used for the manufacture of ammunition including reloading devices, dies, scales, books, pamphlets and documentation, which may be used to facilitate money laundering and drug trafficking activities; and

o.  Indicia of occupancy, residency or ownership of the premises and things described in the warrant, including delivered mail, whether inside the location or in the mail box/s, utility bills, telephone bills, personal letters, personal identification, loan payment receipts, rent receipts, trust deeds, lease of rental agreements, addressed envelopes, escrow documents, tax statements, payroll check stubs, keys and receipts for safe deposit box(s), keys and receipts for rental storage space, keys and receipts for post office box or mail drop rentals, ignition keys, car door and trunk keys, residence keys, vehicle ownership certificates or "pink slips," and/or vehicle registration slips.

p.  Any digital devices or other electronic storage media and/or their components used as a means to commit the violations described above, including:

    i.  any digital device or other electronic storage media capable of being used to commit, further, or store evidence or fruits of the offenses listed above;

    ii.  any digital devices or other electronic storage media used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, cameras, printers, plotters, encryption devices, and optical scanners;

    iii.  any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

      iv.    any documentation, operating logs and reference manuals regarding the operation of the digital device or other electronic storage media or software;

      v.    any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

      vi.    any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

      vii.    any passwords, password files, seed words, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

q. For any digital device or other electronic storage media upon which electronically stored information that is called for by this warrant may be contained, or that may contain things otherwise called for by this warrant:

      i.    evidence of who used, owned, or controlled the digital device or other electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

      ii.    evidence of software that would allow others to control the digital device or other electronic storage media, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      iii.    evidence of the lack of such malicious software;

      iv.    evidence of the attachment to the digital device of other storage devices or similar containers for electronic evidence;

      v.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

      vi.    evidence of the times the digital device or other electronic storage media was used;

      vii.    passwords, encryption keys, seed words, and other access devices that may be necessary to access the digital device or other electronic storage media;

      viii.    documentation and manuals that may be necessary to access the digital device or other electronic storage media or to conduct a forensic examination of the digital device or other electronic storage media;

      ix.    contextual information necessary to understand the evidence described in this attachment.

r. Records and things evidencing the use of an Internet Protocol (IP) address to communicate with the internet, including:

      i.    routers, modems, and network equipment used to connect computers to the internet;

      ii.    records of Internet Protocol addresses used;

      iii.    records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses.

s. Any and all encrypted chat applications used in furtherance of the offenses described above.

THE SEIZURE OF DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA AND/OR THEIR COMPONENTS AS SET FORTH HEREIN IS SPECIFICALLY AUTHORIZED BY THIS

SEARCH WARRANT, NOT ONLY TO THE EXTENT THAT SUCH DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA CONSTITUTE INSTRUMENTALITIES OF THE CRIMINAL ACTIVITY DESCRIBED ABOVE, BUT ALSO FOR THE PURPOSE OF CONDUCTING OFF-SITE EXAMINATIONS OF THEIR CONTENTS FOR EVIDENCE, INSTRUMENTALITIES, OR FRUITS OF THE AFOREMENTIONED CRIME.